116 T.C. No. 14


UNITED STATES TAX COURT


DAVID C. HUTCHINSON, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 15912-98, 15958-98,     Filed March 14, 2001.
        15959-98, 15960-98.


        Held:  Under the alternative cost method of Rev.
Proc. 92-29, 1992-1 C.B. 748, a real estate developer
may allocate to its bases in lots sold $3,707,662 in
estimated construction costs relating to common
improvements.

        Held, further, $5,861,595 in estimated, future-
period interest expense relating to common improvements
does not qualify under the alternative cost method for
allocation to the developer's bases in lots sold.


        Neil D. Kimmelfield, for petitioners.

        Gerald W. Douglas and Nhi T. Luu-Sanders, for respondent.

_____

[1]     Cases of the following petitioners are consolidated
herewith: Isaac M. Kalisvaart and Francien Kalisvaart-Valk,
docket No. 15958-98; William T. Criswell and Sharon L. Criswell,
docket No. 15959-98; Robert S. Bobosky and Judeen M. Bobosky,
docket No. 15960-98.

OPINION

SWIFT, _Judge_:  These cases were consolidated for trial, briefing, and opinion.  For 1994, respondent determined the following deficiencies in petitioners' Federal income tax:

| Petitioners | Deficiency |
|---|---|
| David C. Hutchinson | $442,746 |
| Isaac M. Kalisvaart and Francien Kalisvaart-Valk | 358,095 |
| William T. and Sharon L. Criswell | 188,862 |
| Robert S. and Judeen M. Bobosky | 128,054 |

The issues for decision involve whether, under the alternative cost method of Rev. Proc. 92-29, 1992-1 C.B. 748 (Rev. Proc. 92-29), a real estate developer, in calculating gain on the sale of residential lots sold in 1994, may allocate to the developer's bases in the lots sold estimated construction costs relating to certain common improvements to the development and whether the developer may include, in the calculation of estimated construction costs, estimated, future-period interest expense relating to the common improvements.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1994, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

These cases were submitted fully stipulated under Rule 122, and the stipulated facts are so found.

At the time the petitions were filed, petitioners resided in the following locations:

| Petitioners | Location |
| --- | --- |
| David Hutchinson | Ketchum, Idaho |
| Isaac Kalisvaart and Francien Kalisvaart-Valk | Portland, Oregon |
| William and Sharon Criswell | Wellington, Florida |
| Robert and Judeen Bobosky | Portland, Oregon |

On June 21, 1993, petitioners formed Valley Ranch, Inc. (VRI) as an Idaho corporation, and petitioners elected to have VRI taxed pursuant to subchapter S of the Internal Revenue Code. Petitioners constitute all of the shareholders of VRI.

On December 1, 1993, VRI entered into an option to purchase a 526-acre parcel of partially developed real estate near Sun Valley, Idaho (the Property). Prior to December 1, 1993, the sellers of the Property had begun development of the Property as a golf course residential community.

Also on December 1, 1993, VRI entered into an agreement with the sellers of the Property for VRI to continue to develop the Property as follows:

| Acreage | Use |
| --- | --- |
| 189 Acres | 99 residential lots |
| 162 Acres | Hale Irwin designed golf course |
| 175 Acres | Roads and common areas |

On May 5, 1994, the final plat was recorded for development of the Property as a golf course residential community, and VRI exercised its option and entered into a binding agreement with the sellers to purchase the Property for a total purchase price of $5,715,345.[2]

Beginning in May of 1994 and thereafter through the time these cases were submitted to the Court for decision in February of 2000, VRI improved and sold residential building lots on the Property and realized the sales proceeds therefrom.

Also on May 5, 1994, VRI entered into a contract (the Contract) with Valley Club, Inc. (VCI), a nonprofit Idaho membership corporation whose members would purchase memberships in the golf club. Under the Contract, VRI reaffirmed its obligation to construct on the Property an 18-hole golf course, a driving range, and two practice putting greens. Hereinafter, we refer to these nondepreciable improvements that VRI was obligated to construct on the Property as "the Golf Course".

Under the May 5, 1994, Contract between VRI and VCI, VRI also obligated itself to construct on the Property a golf clubhouse with a restaurant and bar facilities, a golf pro shop,

---

[2] The total purchase price reflected $2,941,000 paid in cash and a $2.5 million promissory note in favor of the sellers of the Property. The $274,345 balance of the total purchase price reflected fees and closing costs associated with purchase of the Property.

golf course maintenance facilities, men's and women's locker rooms, an outdoor swimming pool, and four tennis courts. Hereinafter, we refer to these depreciable improvements that VRI was obligated to construct on the Property as "the Clubhouse".

Under the Contract between VRI and VCI, ownership of the completed Golf Course and the Clubhouse was to be transferred to VCI, and VCI was to establish and operate a golf membership club (the Club) which would sell memberships in the Club to homeowners within the Golf Course community and to members of the public.

Under the Contract, in consideration for the transfer to VCI of VRI's ownership interest in the Golf Course and in the Clubhouse that were to be constructed by VRI, VCI, among other things, was obligated to pay to VRI the total fees that would be received by VCI upon the sale by VCI of memberships in the Club.

In order to secure the respective rights and obligations of VRI and VCI under the Contract, during construction of the Golf Course and the Clubhouse, the deed executed by VRI transferring the Golf Course and the Clubhouse to VCI was to be transferred into escrow, and the membership fees, upon receipt by VCI, were to be transferred by VCI into an escrow account.

The deed to the Golf Course and the Clubhouse was to be transferred out of escrow to VCI on the earlier of December 31, 2000, or when at least 25 charter memberships, 375 golf memberships, and 100 golf social memberships in the Club were

sold. The membership fees held in escrow were to be transferred out of escrow to VRI according to the following schedule:

| Fees in escrow to be transferred | Schedule |
|---|---|
| 1/3 | Upon completion of 9 holes of the Golf Course |
| 1/3 | Upon completion of the Golf Course |
| 1/3 | Upon completion of the Clubhouse |

After completion of construction of the Golf Course and the Clubhouse, fees received by VCI upon sale of additional memberships in the Club would be transferred directly to VRI as further compensation to VRI for transfer to VCI of ownership of the Golf Course and the Clubhouse.

In 1994, VRI began construction of the Golf Course and the Clubhouse, and VRI proceeded to sell the residential lots on the Property. New owners of the residential lots, or their contractors, began building homes on the lots, and VCI proceeded to sell memberships in the Club.

Prior to construction, VRI estimated its total costs to construct the Golf Course and the Clubhouse (not including VRI's $5,715,345 initial purchase price for the Property) as follows:

|                    | Estimated Costs |
|--------------------|-----------------|
| The Golf Course    | $13,390,624     |
| The Clubhouse      | 3,707,662       |
| Employee Housing   | 375,000[1]      |
| Finance Costs      | 5,861,595[2]    |
|                    |                 |
| Total Estimated Costs | $23,334,881  |

_____

[1]    The costs of employee housing are not in dispute.

[2]    Total estimated finance costs relating to both the Golf Course and
the Clubhouse equaled $7,022,000.  The $5,861,595 set forth above
represents the difference between the $7,022,000 total estimated
finance costs and the $1,160,405 actual finance costs incurred by
VRI in 1994.

VRI undertook substantial interest-bearing debt obligations
in connection with the construction of the Golf Course and the
Clubhouse.

On July 10, 1996, prior to completion of the Golf Course and
the Clubhouse, VRI executed in favor of VCI and transferred into
escrow, a deed with respect to ownership of the Golf Course and
the Clubhouse.

In the summer of 1996, construction of the Golf Course and
the Clubhouse was completed by VRI.

On July 19, 1996, the Golf Course and the Clubhouse opened
and play began.

Also on July 19, 1996, upon completion of construction of
the Golf Course and the Clubhouse, apparently because VCI had not
sold the required number of Club memberships, the deed to the

Golf Course and the Clubhouse was not transferred out of escrow to VCI.

Also because VCI had not sold the required number of memberships, pursuant to the Contract, during the balance of 1996, 1997, 1998, and until April 21, 1999, VRI managed and operated the Golf Course and the Clubhouse on behalf of VCI. We refer to this period of time (namely, the period of time after completion of the Golf Course and the Clubhouse during which VRI continued to manage and operate the Golf Course and the Clubhouse) as the "transition period".

Under the Contract, during the transition period, VRI realized the profits and losses relating to operation of the Golf Course and the Clubhouse. The bylaws of VCI, however, limited the amount of annual dues (as distinguished from membership fees) that could be collected from Club members to pay for operation of the Golf Course and the Clubhouse, and cumulative losses of approximately $994,393 were realized by VRI during the transition period in connection with VRI's operation of the Golf Course and the Clubhouse. The operational losses apparently were caused by the fact that the member base in the Club was not yet large enough to generate sufficient dues and other revenue to cover the operating expenses.

During the transition period, VCI, not VRI, was responsible for decisions and costs of any further improvements made to the Golf Course and to the Clubhouse.

Up until July 19, 1996, the day the Golf Course and the Clubhouse opened, all property-related insurance relating to the Golf Course and the Clubhouse was paid by VRI. After July 19, 1996, VCI paid all property-related insurance relating to the Golf Course and the Clubhouse.

Under the Contract, any increase or decrease in the underlying fair market value of the Golf Course and the Clubhouse that occurred during the transition period, would accrue, not to VRI, but to VCI.

In 1997, because of potential conflicts of interest between VRI and the board of directors of VRI, some members of the Club, individually and on behalf of VCI, filed a lawsuit against VRI and the individual owners of VRI (namely, petitioners). One of the issues in the lawsuit involved the validity of the Contract.

On April 21, 1999, VRI, petitioners, VCI, and members of VCI arrived at a comprehensive settlement of the above lawsuit. Pursuant to the settlement, on April 21, 1999, VRI turned over to VCI operation and management of the Golf Course and the Clubhouse, and the deed and legal title to the Golf Course and the Clubhouse were transferred out of escrow to VCI.

VRI's 1994 U.S. Income Tax Return for an S Corp. (Form 1120S) was prepared using the alternative cost method under Rev. Proc. 92-29, to allocate a ratable portion of the following total actual and estimated costs to VRI's cost bases in all of the residential lots on the Property:

| Total Actual and Estimated Costs and Expenses to be Allocated | Amount |
|---|---|
| VRI's total actual acquisition costs for the Property | $ 5,715,345 |
| VRI's total estimated construction costs for the Golf Course | 13,390,624 |
| VRI's total estimated construction costs for the Clubhouse | 3,707,662 |
| VRI's total actual 1994 interest expense relating to both the the Golf Course and the Clubhouse | 1,160,405 |
| VRI's total estimated post-1994 interest expense relating to the Golf Course and the Clubhouse | 5,861,595 |
| Total | $29,835,631 |

On VRI's 1994 Federal income tax return, in computing its gain on the residential lots sold in 1994, VRI computed its cost bases in the lots based on an allocation of the above total actual and estimated costs for the Golf Course and the Clubhouse, thereby reducing VRI's reported gain for 1994 with respect to the lots sold.

During the transition period, on VRI's 1996, 1997, 1998, and 1999 Federal income tax returns for an S Corp., VRI apparently did not claim any depreciation deductions with respect to its costs of constructing the Golf Course and the Clubhouse.

In the statutory notice of deficiency, respondent treated VRI's development and sale of the residential lots on the Property as a project separate from VRI's construction of both the Golf Course and the Clubhouse, and therefore respondent

disallowed VRI's allocation, under the alternative cost method, of the total estimated costs of constructing the Golf Course and the Clubhouse to VRI's cost bases in the residential lots sold in 1994.

Shortly before trial herein was scheduled to take place, however, respondent abandoned his contention that the Golf Course and the Clubhouse constituted projects separate from VRI's development and sale of the residential lots. Respondent acknowledged that the Golf Course and the Clubhouse constituted a single project integrated with VRI's development and sale of improved residential lots. Respondent acknowledged that VRI could allocate under the alternative cost method the estimated costs of constructing the Golf Course to the lots sold. Respondent, however, for the first time in a pretrial brief contended that VRI had retained an ownership interest in the Clubhouse in 1994 and through the transition period, and therefore that the estimated construction costs of the Clubhouse would have been recoverable to VRI through depreciation and did not qualify under the alternative cost method for allocation by VRI to the lots sold in 1994 and in subsequent years.

More specifically, with respect to VRI's $13,390,624 in total estimated construction costs of the Golf Course (all of which related to nondepreciable improvements to the Property), respondent acknowledged that those estimated costs qualified

under the alternative cost method and were properly allocated by VRI to the lots sold in 1994 and in subsequent years.

With respect, however, to VRI's $3,707,662 in total estimated construction costs of the Clubhouse (all of which related to depreciable improvements to the Property), respondent concluded that VRI's alleged retained ownership of the Clubhouse before and during the transition period (during which time VRI allegedly would have been able to recover its costs thereof through depreciation) disqualified VRI from using the alternative cost method to allocate to the lots sold the estimated Clubhouse construction costs.

Further, respondent concluded that VRI's $5,861,595 in estimated future-period interest expense with respect to its debt obligations relating both to the Golf Course and to the Clubhouse did not qualify as estimated construction costs under the alternative cost method and could not be allocated to the cost of the lots sold.

Procedurally, petitioners do not object to respondent's change in position and to respondent's new contentions regarding VRI's use of the alternative cost method for its estimated Clubhouse construction costs and estimated interest expense relating to the Golf Course and to the Clubhouse. Petitioners, however, argue that respondent should have the burden of proof regarding any underlying factual disputes relating to

respondent's new contentions.  Respondent counters that under our Rules the new contentions should be treated only as new theories, not as new issues, and that the burden of proof should remain with petitioners on all factual matters.

## Discussion

Generally, under Rev. Proc. 75-25, 1975-1 C.B. 720 (Rev. Proc. 75-25), a real estate developer was allowed, in the first year of construction of a development, to allocate to the developer's cost bases in separate lots to be sold certain estimated construction costs of improvements common to the entire development.  The purpose of Rev. Proc. 75-25 was to allow a real estate developer to spread more evenly and fairly the amount of the developer's gain or loss relating to a real estate development over the years of construction.  By allocating, at the beginning of a development, estimated construction costs relating to common improvements to the developer's cost bases in lots to be sold, a developer was able to recognize less income in the early years of a development as lots were being sold (as a result of the increased cost bases in the lots on which the developer's taxable gain was computed).

In Herzog Bldg. Corp. v. Commissioner, 44 T.C. 694, 702-703 (1965), involving a predecessor ruling to Rev. Proc. 75-25,[3] we

---

[3]    Mim. 4027, XII-1 C.B. 60 (1933).

explained the purpose and application of the alternative cost
method as follows:

> Where a developer is bound by contract to
> make certain improvements for the benefit of
> the property sold, the fact that the
> expenditure required to install the
> improvement is not made during the taxable
> period within which part of the property is
> sold should not prevent an aliquot portion of
> the cost from being offset against the profit
> from the sale of the property.  [Citation
> omitted.]

To qualify under Rev. Proc. 75-25, among other requirements,
a developer had to have a contractual obligation to provide the
common improvement costs which were to be estimated and
allocated, and the common improvements could not be recoverable
by the developer through depreciation.

In 1984, Congress enacted sec. 461(h) to postpone the
deductibility to taxpayers of many costs until "economic
performance" occurs.  Deficit Reduction Act of 1984, Pub. L. 98-
369, 98 Stat. 598.  Generally, under section 461(h), if property
or services are to be provided by taxpayers, economic performance
is not regarded as having occurred until the taxpayers actually
incur the costs of providing the property or services.

Proposed regulations under section 461(h) were issued on
June 7, 1990, and adopted on April 9, 1992.  See 55 Fed. Reg.
23235 (June 7, 1990), 57 Fed. Reg. 12411 (April 10, 1992).  The
preamble to the section 461(h) regulations, as proposed,

explained that, because under section 461(h) economic performance was required in order for costs to be deducted, a real estate developer would no longer be allowed to allocate estimated future construction costs to the developer's bases in lots sold. See Notice 91-4, 1991-1 C.B. 315. Thus, it appeared that the economic performance rules of 461(h) would effectively override the alternative cost method available to developers under Rev. Proc. 75-25.

On January 11, 1991, however, respondent issued Notice 91-4, 1991-1 C.B. 315, in which respondent provided that, in spite of the economic performance rule of section 461(h), the alternative cost method under Rev. Proc. 75-25 would continue generally to be available to developers of real estate until additional guidance from respondent was provided.

On April 9, 1992, the above regulations under section 461(h) were finalized, but the referenced language in the preamble to the proposed regulations was eliminated. See regulations under sec. 461.

Also, on April 9, 1992, respondent issued Rev. Proc. 92-29, 1992-1 C.B. 748, in which a limited version of the alternative cost method was provided. Under the alternative cost method provided in Rev. Proc. 92-29, a real estate developer was permitted to continue to allocate to lots sold the estimated future construction costs relating to common improvements without

regard to whether the costs would qualify as incurred under the economic performance rule of section 461(h), but the amount of such costs that would qualify for this allocation was limited in any 1 year to the total cumulative amount of actual construction costs for common improvements that, as of the end of each year, the developer had incurred in the entire development.

Under Rev. Proc. 92-29, as under Rev. Proc. 75-25, use of the alternative cost method was limited to estimated costs of the common improvements that the developer was contractually obligated to construct in the development and that would not be recoverable by the developer through depreciation.  The limited alternative cost method as set forth in Rev. Proc. 92-29 applies to the year before us in these cases.

### $3,707,662 in Estimated Clubhouse Construction Costs

The disagreement between the parties regarding allocation of VRI's estimated Clubhouse construction costs under the alternative cost method centers on whether VRI, at any time, would have been able to recover its actual construction costs in the Clubhouse through depreciation.  See Rev. Proc. 92-29, sec. 2.01, 1992-1 C.B. 748, 749.

Petitioners contend that at no time during construction of the Clubhouse beginning in 1994 and after construction through the transition period would VRI have had the right to recover its Clubhouse construction costs through depreciation.

Petitioners also contend that the issue of whether VRI's Clubhouse construction costs would have been recoverable by VRI through depreciation represents a new factual issue under Rule 142(a) and that respondent should bear the burden of proof with regard thereto.

Respondent contends that ownership of the Clubhouse was held by VRI during construction from 1994 through the transition period and until April 21, 1999, when the deed to the Golf Course and to the Clubhouse was transferred out of escrow to VCI, and therefore that VRI had a depreciable interest in the Clubhouse.

Generally, for the years in issue, the burden of proof is on the taxpayer with regard to factual issues. Rule 142(a), however, states that in the case of any "new matter" the burden of proof shall be upon respondent. In Wayne Bolt & Nut Co. v. Commissioner, 93 T.C. 500, 507 (1989), we summarized the distinction between new theories that are treated as new issues and new theories that simply supplement previously raised issues as follows:

> A new theory that is presented to sustain a deficiency is treated as a new matter when it either alters the original deficiency or requires the presentation of different evidence. A new theory which merely clarifies or develops the original determination is not a new matter in respect of which respondent bears the burden of proof. [Citations omitted.]

In respondent's notices of deficiency to petitioners, respondent determined that the development and sale of VRI's residential lots, on the one hand, and the Golf Course and Clubhouse, on the other hand, constituted two separate development projects (i.e., that the Golf Course and Clubhouse were not improvements common to the development of the residential lots) and that VRI therefore could not, under the alternative cost method, allocate to the residential lots the costs of constructing the Golf Course and the Clubhouse.

As explained, in respondent's pretrial memorandum, respondent abandoned the contention that the residential lots, the Golf Course, and the Clubhouse constituted separate projects, and for the first time respondent contended that VRI, not VCI, owned the completed Clubhouse, had a depreciable interest in the Clubhouse, and would have been able to recover its actual construction costs through depreciation, and therefore that VRI could not use the alternative cost method to allocate its estimated Clubhouse construction costs to its bases in the residential lots.

The evidence relevant to whether development of the residential lots, the Golf Course, and the Clubhouse constituted a single project is quite different from the evidence required of petitioners to prove, as between VRI and VCI, ownership of, and the existence of a depreciable interest in, the Clubhouse.

Respondent's new theory constitutes a new, different matter, not just another version of an issue or an adjustment previously raised in a notice of deficiency, and respondent bears the burden of proof regarding this fact issue. See Barton v. Commissioner, 993 F.2d 233 (11th Cir. 1993), affg. without published opinion T.C. Memo. 1992-118; Abatti v. Commissioner, 644 F.2d 1385, 1390 (9th Cir. 1981), revg. T.C. Memo. 1978-392; see also sec. 7522; Shea v. Commissioner, 112 T.C. 183 (1999).

The period for depreciation of property begins when property is placed in service. See sec. 1.167(a)-10(b), Income Tax Regs.

Accordingly, VRI's construction costs relating to the Clubhouse are properly regarded as recoverable through depreciation only if, and for the period that, VRI possessed an ownership interest in the Clubhouse after the Clubhouse was placed in service.

Generally, property is placed in service when it reaches a condition of readiness and availability for a specifically assigned function. See sec. 1.167(a)-11(e)(1), Income Tax Regs. On July 19, 1996, the Golf Course and the Clubhouse opened and play began. Absent evidence in these cases to the contrary, and in light of respondent's burden of proof on this issue, we treat July 19, 1996, as the date the Clubhouse was placed into service.

Because the Clubhouse was not placed in service until July 19, 1996, from the time construction of the Clubhouse began

in 1994 through July 18, 1996, VRI did not have an interest in the Clubhouse properly recoverable through depreciation, and we reject respondent's contention that because VRI allegedly had an ownership interest in the Clubhouse during construction, VRI is not qualified to allocate estimated Clubhouse construction costs under the alternative cost method.

The question of whether VRI would have been able to recover its Clubhouse construction costs through depreciation because it allegedly had a depreciable interest in the Clubhouse during the transition period (namely, on or after the Clubhouse was placed in service on July 19, 1996, and until April 21, 1999, the date the deed to the Clubhouse was transferred out of escrow to VCI), turns on an analysis of the benefits and burdens relating to ownership of the Clubhouse during the transition period. See Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1235-1238 (1981). Who possesses the benefits and burdens of ownership of property constitutes a question of fact which is generally ascertained from the intentions of the parties as evidenced by the written agreements read in light of all the relevant facts and circumstances. See Durkin v. Commissioner, 87 T.C. 1329, 1367 (1986), affd. 872 F.2d 1271 (7th Cir. 1989).

Some of the factors used by courts in analyzing whether taxpayers possess the benefits and burdens of ownership of property are: (1) Who has legal title to the property; (2) whom

the parties treat as possessing the benefits and burdens of ownership; (3) who has equity in the property; (4) whether the taxpayer has a present obligation to execute and deliver a deed and whether the purchaser has a present obligation to make payments; (5) who has the rights of possession to the property; (6) who pays the property taxes; (7) who bears the risk of loss or damage to the property; and (8) who receives the profits from the operation and sale of the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238.

Ownership of real property may be transferred even though title thereto is retained by the seller or is in escrow for security purposes. See Clodfelter v. Commissioner, 48 T.C. 694, 700 (1967), affd. 426 F.2d 1391 (9th Cir. 1970).

On July 10, 1996, prior to the time the Clubhouse was placed in service, VRI transferred into escrow title to the Clubhouse. Thereafter, during the transition period, title to the Clubhouse was held in escrow in VCI's name. VCI stood to benefit from an increase in the fair market value of the Clubhouse, and VCI would suffer economically for any decrease in the fair market value of the Clubhouse.

Also during the transition period, VCI was obligated and did pay for the insurance relating to the Clubhouse.

Transfer to VCI of legal title to the Clubhouse was scheduled to occur no later than December 31, 2000, regardless of

how much VRI had received in membership fees and regardless of the amount of VRI's losses in connection with operation of the Clubhouse during the transition period.

Under the Contract, until transfer of title from the escrow to VCI, VRI was required to fund any deficit and to retain any net income from operating the Clubhouse. VCI, however, during the transition period had control over the amount of dues charged to members, and VCI thereby largely controlled the income or loss to be realized from operation of the Clubhouse.

With regard specifically to a depreciable ownership interest in property, in Commissioner v. Moore, 207 F.2d 265, 268 (9th Cir. 1953), revg. and remanding 15 T.C. 906 (1950), the Court of Appeals for the Ninth Circuit stated:

> It is not the physical property itself, nor the title thereto, which alone entitles the owner to claim depreciation. The statutory allowance is available to him whose interest in the wasting asset is such that he would suffer an economic loss resulting from the deterioration and physical exhaustion as it takes place. * * *

See also Weiss v. Weiner, 279 U.S. 333 (1929); Geneva Drive-In Theatre, Inc. v. Commissioner, 622 F.2d 995 (9th Cir. 1980).

In petitioners' post-trial brief, petitioners accurately summarize the transaction before us as follows:

> VRI acquired the Project for a single purpose -- to create (1) valuable homesites abutting a first-class golf course and (2) valuable golf club memberships and to

liquidate its entire investment in the Project at a profit by selling the homesites and memberships. In furtherance of that purpose, on the very day that VRI acquired the Project, VRI also entered into a Purchase and Sale Agreement with the Club, a non-profit membership corporation, under which VRI irrevocably committed itself to construct golf-related improvements and to convey those improvements (the Club Facilities) to the Club, retaining only the right to proceeds from the sale of a specified number of Club memberships, and placing the title to the Club Facilities in escrow to protect its interest in those sale proceeds. * * *

We conclude that respondent has failed to meet his burden of proving that, during the transition period, VRI, not VCI, possessed the benefits and burdens of ownership of the Clubhouse. Also, apart from the burden of proof on this fact issue, we conclude that the evidence establishes that, during the transition period, VCI possessed the benefits and burdens of ownership of the Clubhouse. The estimated construction costs associated with the Clubhouse, therefore, are not to be regarded as recoverable by VRI through depreciation during the transition period.

Because VRI would not be able to recover its construction costs through depreciation during either the construction period or the transition period, VRI's estimated construction costs relating to the Clubhouse may be allocated to the bases of the residential lots sold in 1994 under the alternative cost method of Rev. Proc. 92-29, subject to the limitations thereof.

Respondent argues that the failure of VRI and VCI to adhere strictly to the terms of the Contract indicates that VRI and VCI did not regard the Contract as binding and that we should disregard the terms of the Contract. We disagree. The deed to the Clubhouse was transferred into escrow before the placed-in-service date of July 19, 1996, the relevant date for purposes of establishing in these cases ownership of and a depreciable interest in the Clubhouse. The fact that the deed to the Clubhouse was not transferred into escrow until shortly before completion of construction is not particularly significant. Also, in light of the indicia of ownership set forth above, the fact that a formal written lease of the Clubhouse between VRI and VCI was not executed during the transition period is not particularly significant. We believe that the terms under which the Clubhouse would be operated during the transition period as between VRI and VCI were adequately set forth in the Contract, and respondent has pointed us to nothing that represents a failure to adhere to that agreement in any substantial way.

Respondent relies on language in the 1999 settlement agreement between VRI, petitioners, VCI, and members of VCI as follows:

> Turnover Date is defined as of the date when all documents necessary to carry out this agreement are removed from escrow * * * and ownership, possession, and control of the property * * * is actually transferred from VRI to VCI.

We regard use in the above settlement agreement of the term "ownership" as simply protective and as not indicative of true ownership of the Clubhouse.  We do not find this language from the 1999 settlement agreement arising out of a legal dispute as controlling with respect to ownership of the Clubhouse during the transition period.

Estimated Future-Period Interest Expense

In Rev. Proc. 92-29, sec. 4.01, 1992-1 C.B. 748, 750, in a general explanation of the alternative cost method, reference is made to the general capitalization rules and the interest capitalization rules of section 263A(f) as follows:

> The alternative cost method does not affect the application of general capitalization rules to developers of real estate.  Thus, common improvement costs incurred under section 461(h) of the Code are allocated among the benefitted properties and may provide the basis for additional computations (e.g., interest capitalization under section 263A(f)).

Petitioners contend generally that (regardless of the above specific reference in Rev. Proc. 92-29 to the continued application to developers of the general capitalization rules and of the interest capitalization rule of section 263A(f)), the history and purpose of Rev. Proc. 75-25 support their argument that estimated interest expense should be included in the

calculation of a developer's estimated construction costs for common improvements under the alternative cost method.

We disagree. We believe that the above specific reference in Rev. Proc. 92-29 to section 263A(f) makes it clear that under the alternative cost method the interest capitalization rule of section 263A(f) applies and prevents the allocation (to a developer's cost bases in lots sold in a particular year) of estimated future-period interest expense. Under section 263A(f), only those interest expenses that are paid or incurred during the production period are to be capitalized in the year paid or incurred. Section 263A(f) provides in part as follows:

> SEC. 263A(f) Special Rules For Allocation of Interest to Property Produced by the Taxpayer.--
>
> (1) Interest capitalized only in certain cases.--Subsection (a) shall only apply to interest costs which are--
>
> (A) paid or incurred during the production period, * * *

The "paid" or "incurred" requirement of section 263A(f) precludes petitioners' claim that estimated future-period interest expense may be estimated and allocated to the basis of lots sold in a particular year under the alternative cost method.

Our interpretation is consistent with the general economic performance rule of section 461(g) and (h), under which interest expense is not added to the bases of property until the expense

is incurred.  Our interpretation is also consistent with the requirement under Rev. Proc. 92-29, 1992-1 C.B. 748, 749, that to qualify for allocation under the alternative cost method the "developer must be contractually obligated or required by law to provide" the improvements relating to the estimated cost.  VRI was contractually obligated under the Contract to construct the Golf Course and the Clubhouse.  VRI, however, was not obligated under the Contract to obtain interest-bearing debt for such endeavor and merely chose to finance construction of the Golf Course and the Clubhouse based on its current financial condition and presumably could have paid off such debt at any time.[4]

Petitioners rely on Haynsworth v. Commissioner, 68 T.C. 703 (1977), affd. without published opinion 609 F.2d 1007 (5th Cir. 1979), in support of their position that estimated future-period

---

[4]     Rev. Proc. 92-29, sec. 2, 1992-1 C.B. 748, 749, defines common improvements as follows:

.01 Common Improvement.  For purposes of this revenue procedure, the term "common improvement" means any real property or improvements to real property that benefit two or more properties that are separately held for sale by a developer.  The developer must be contractually obligated or required by law to provide the common improvement and the cost of the common improvement must not be properly recoverable through depreciation by the developer. * * * Examples of common improvements include streets, sidewalks, sewer lines, playgrounds, clubhouses, tennis courts, and swimming pools that the developer is contractually obligated or required by law to provide and the costs of which are not properly recoverable through depreciation by the developer.

interest expense should be treated as estimated construction costs and available for allocation under the alternative cost method. In <u>Haynsworth</u>, the taxpayer included interest expense in their estimate of anticipated development costs for purposes of computing cost-of- goods-sold, but, as a result of payment of the mortgage on the property, the taxpayer eliminated the interest from its adjusted estimates. Petitioners claim that <u>Haynsworth</u> indicates a long accepted practice of including interest expense in the estimated costs of common improvements.

Treatment of the interest expense was not at issue in <u>Haynsworth</u>. The interest expense mentioned in <u>Haynsworth</u> was removed from the total estimated costs in a year before the years in dispute. We reject petitioners' argument that interest expense should be included in estimated construction costs based on <u>Haynsworth</u> or some accepted practice regarding estimated interest expense.

Rev. Proc. 92-29, 1992-1 C.B. 748, provides an alternative to the economic performance rules under section 461(h) for determining when estimated construction costs may be included in the bases of lots sold. In enacting the economic performance rule, Congress was concerned that allowing taxpayers to take current deductions for future obligations overstated the true costs because the time value of money was not taken into account.

See Staff of Joint Comm. on Taxation, General Explanation of the Deficit Reduction Act of 1984, at 260 (J. Comm. Print 1984).

Rev. Proc. 92-29 provides a limited exception to section 461(h), and anything not specifically within the provisions of Rev. Proc. 92-29 would generally be governed by the economic performance rule of section 461(h).  Rules of statutory construction suggest that if a statute (or other authority) specifies exceptions to a statute's general application, other exceptions not explicitly mentioned should not be implied.  See United States v. Lande, 968 F.2d 907, 910 (9th Cir. 1992).

We conclude that under Rev. Proc. 92-29, VRI may not include estimated interest expense in the calculation of estimated construction costs to be allocated to the bases in the lots VRI sold in 1994.

To reflect the foregoing,

Decisions will be entered under Rule 155.