# United States Tax Court

REVIEWED
165 T.C. No. 10

SUNIL S. PATEL AND LAURIE MCANALLY PATEL, ET AL.,[1]
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————

Docket Nos. 24344-17, 11352-18,
25268-18.

Filed November 12, 2025.

————

Ps claimed deductions under I.R.C. § 162 on their 2013, 2014, 2015, and 2016 tax returns for amounts paid to purported captive insurance companies A and B and to entity C, which purported to reinsure a portion of A and B's risk. R denied the deductions and determined that Ps are liable for accuracy-related penalties under I.R.C. § 6662(a), including penalties under I.R.C. § 6662(b)(6), which applies the economic substance doctrine as codified under I.R.C. § 7701(o). In *Patel v. Commissioner*, T.C. Memo. 2024-34, we held that amounts paid to insurance companies A and B were not insurance premiums for federal income tax purposes.

*Held*: The codified economic substance doctrine requires a relevancy determination within the meaning of I.R.C. § 7701(o).

*Held, further*, the codified economic substance doctrine is relevant in these cases.

————

[1] Cases of the following petitioners have been consolidated herewith for purposes of trial, briefing, and disposition: Sunil S. Patel and Laurie M. McAnally-Patel, Docket Nos. 11352-18 and 25268-18.

*Held, further*, Ps are liable for penalties under the codified economic substance doctrine pursuant to I.R.C. § 6662(a) and (b)(6) and the increased rate under I.R.C. § 6662(i), for the relevant tax years at issue, as limited by *Patel v. Commissioner*, T.C. Memo. 2020-133.

*Held, further*, Ps are liable for the remaining accuracy-related penalties under I.R.C. § 6662(a), as set forth herein and as limited by *Patel*, T.C. Memo. 2020-133.

JONES, *J.*, wrote the opinion of the Court, which URDA, *C.J.*, and KERRIGAN, BUCH, NEGA, PUGH, ASHFORD, COPELAND, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ.*, joined.

———————

*David D. Aughtry* and *Patrick J. McCann, Jr.*, for petitioners.[2]

*Nicholas D. Doukas*, *Alicia H. Eyler*, and *William D. Richard*, for respondent.

JONES, *Judge*: This Opinion addresses issues reserved by our prior opinions in *Patel v. Commissioner* (*Patel I*), T.C. Memo. 2020-133, and *Patel v. Commissioner* (*Patel II*), T.C. Memo. 2024-34. In *Patel II*,

---

[2] Briefs amici curiae were filed by (1) *Robert J. Kovacev* and *Samuel A. Lapin* as attorneys for The Chamber of Commerce of the United States of America; (2) *David M. Brotz*, *George M. Clarke III*, *Joseph B. Judkins*, *Carlton A. Tarpley*, and *Joy A. Williamson* as attorneys for Alliance for Business Partnerships; (3) *H. Craig Pitts*, *Brett D. Sanger*, and *Mark A. Weitz* as attorneys for Modoc Nation; (4) *Joseph D. Henchman* as attorney for the National Taxpayers Union Foundation; (5) *Jonathan C. Bond*, *Nicole M. Butze*, *Michael J. Desmond*, *Matt Donnelly*, *Lucas C. Townsend*, and *Lael D. Weinberger* as attorneys for the National Association of Manufacturers; (6) *Jenny A. Austin*, *May Y. Chow*, *Anne Gordon*, and *Gary B. Wilcox* as attorneys for National Foreign Trade Council, Inc.; (7) *David B. Blair* and *William E. Sheumaker* as attorneys for Eversheds Sutherland (US) LLP; (8) *Miriam L. Fisher*, *Molly C. Harding*, *Elizabeth A. Kanyer*, and *Jean A. Pawlow* as attorneys for the American College of Tax Counsel; (9) *Kelsey Merrick* as attorney for The Tax Law Center at NYU Law; and (10) *George Gerachis*, *Gary Huffman*, *Stephen Josey*, and *Kathleen Pakenham* as attorneys for American Forest & Paper Association. At respondent's request, we ordered the parties to file briefs in response to the amicus briefs. At the parties' request, we held oral argument on the issues raised by the briefs.

T.C. Memo. 2024-34, at *52, the Court held that the transactions at issue did not constitute insurance for federal income tax purposes. Accordingly, the Court sustained the Commissioner's deficiency determinations and the disallowance of those deductions for taxable years 2013, 2014, 2015, and 2016 (tax years at issue). *Id.* Now, the remaining issue for decision is whether Sunil S. Patel, M.D. (Dr. Patel), and Laurie M. McAnally-Patel, M.D. (Dr. McAnally-Patel),[3] are liable for accuracy-related penalties for the tax years at issue, as limited by our prior opinion, *Patel I*, T.C. Memo. 2020-133. *See also Patel II*, T.C. Memo. 2024-34, at *3 n.5.

The Notices of Deficiency (NODs) for the tax years at issue listed several alternative grounds for respondent's imposition of penalties, including that the transactions lacked economic substance within the meaning of section 6662(b)(6).[4] In this Opinion, we will address, inter alia, the Internal Revenue Service's (IRS) determination that the transactions lacked economic substance and its assertion of penalties on that ground.[5]

For the reasons set forth herein, we will sustain the Commissioner's determinations with respect to the codified economic substance doctrine under section 6662(a) and (b)(6), as well as the increased penalty under section 6662(i). We will also sustain the remaining accuracy-related penalties, as set forth herein.

FINDINGS OF FACT

We summarize our findings of fact from *Patel I* and *Patel II*. We also make additional findings of fact.

---

[3] We sometimes refer to Dr. Patel and Dr. McAnally-Patel as the Patels.

[4] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulatory references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times, and Rule references are to the Tax Court Rules of Practice and Procedure. All monetary amounts are rounded to the nearest dollar.

[5] We understand the interaction of section 6662(a) and (b)(6) to impose a single penalty. Because the Commissioner determined that penalty for multiple years (each of the tax years at issue), we will refer to it in the plural (penalties).

I.      *Dr. Patel's Background and Decision to Form First Microcaptive[6]*

Dr. Patel has practiced medicine in Texas since 1997. He has an extensive education that includes a doctor of philosophy degree in immunology and a doctor of medicine degree. *Patel II*, T.C. Memo. 2024-34, at *4.

Dr. Patel also has an extensive business background. *Id.* He has formed multiple medical-related businesses, including his own eye surgery practice, Ophthalmology Specialists of Texas (OST), where he specializes in the evaluation and management of certain eye-related medical conditions. *Id.* at *4–5. Dr. Patel also conducts clinical research trials through two companies he established: Integrated Clinical Research, LLC (ICR), and Strategic Clinical Research Group, LLC (SCR). *Id.* at *5.

After reading books on asset management and captive insurance, Dr. Patel decided to form a captive insurance company. *Id.* at *6–7. A colleague introduced Dr. Patel to a financial planner, Christopher Fay, to discuss financial and insurance products. *Id.* at *7.

But even before the introductory call with Mr. Fay, Dr. Patel already knew he wanted to form a captive insurance company because of his self-study. *Id.* Dr. Patel describes himself as a "savvy financial person" and stated that he did not want any advice from Mr. Fay. *Id.* Rather, Dr. Patel knew that he wanted to form a captive insurance company before engaging Mr. Fay. *Id.*

Although Dr. Patel disclaimed any interest in financial advice from Mr. Fay, he nonetheless completed a financial feasibility study at Mr. Fay's request. *Id.* Dr. Patel's answers on the feasibility study did not address captive insurance or the need for insurance products. *Id.* at *8.

---

[6] As we explained in *Patel II*, T.C. Memo. 2024-34, at *2 n.3, "[a] 'captive insurance company' is a corporation whose stock is owned by one or a small number of companies and which handles all or a part of the insurance needs of its shareholders or their affiliates." *Caylor Land & Dev., Inc. v. Commissioner*, T.C. Memo. 2021-30, at *8 n.4; *see also Harper Grp. v. Commissioner*, 96 T.C. 45, 46 n.3 (1991), *aff'd*, 979 F.2d 1341 (9th Cir. 1992). In our prior cases, we have adopted the term "microcaptive" to refer to "a small captive insurance company," i.e., one that takes in less than $1.2 or $2.2 million (adjusted for inflation) in premiums depending on the tax year at issue. *See Caylor Land & Dev.*, T.C. Memo. 2021-30, at *8 n.4; *see also Avrahami v. Commissioner*, 149 T.C. 144, 179 (2017); *Keating v. Commissioner*, T.C. Memo. 2024-2, at *50 n.52 (explaining that amendments to section 831(b) increased the premium ceiling).

Dr. Patel stated that his goals were aggressive growth and wealth accumulation. *Id.*

Mr. Fay recommended that Dr. Patel meet with Sean King[7] of CIC Services, LLC (CIC Services), to discuss forming a microcaptive. *Id.* at *7. In an email sent to facilitate a meeting between Dr. Patel and Mr. Sean King, Mr. Fay stated that Dr. Patel was the "MD paying almost 2.5M in income taxes and did his own research on [microcaptive insurance companies]. He wants to talk with Sean about doing potentially 2 [captive insurance companies]." *Id.* Indeed, many of the contemporaneous emails exchanged during the tax years at issue contain similar suggestions that the purpose of forming a captive was tax avoidance, not insurance protection. *Id.* at *7–8.

In June 2011 Dr. Patel met with Mr. Sean King and Mr. Fay. *Id.* at *8. Since Dr. Patel already knew that he wanted to form a captive, the meeting was focused on discussing the formation and structure of a captive insurance company, not whether a captive was necessary for Dr. Patel's businesses. *Id.*

Mr. Sean King advised that CIC Services could manage a captive for Dr. Patel. *Id.* However, he recommended attorneys that Dr. Patel could contact to form a captive, including James Coomes. *Id.* In July 2011, without conducting any studies related to the need to form a captive, Dr. Patel informed Mr. Fay that he wanted to move forward with forming two captive insurance companies. *Id.*

Dr. Patel retained Mr. Coomes—a tax attorney who has focused his practice on captive insurance, as well as business and estate planning—to help form a captive. *Id.* at *8–9. Mr. Coomes does not have formal training in captive insurance or writing insurance policies. *Id.* at *9. Rather, he learned to write insurance policies by self-study, including reviewing commercial insurance policies, reading articles, and studying books. *Id.*

---

[7] In *Patel II*, T.C. Memo. 2024-34, we discussed facts about both Thomas King and Sean King. As we mentioned in *Patel II*, Thomas King of CIC Services is Sean King's father. *See id.* at *7 n.10. Although we do not discuss Thomas King in this Opinion, for clarity and for the sake of consistency with our prior opinion, we will continue to refer to them as Mr. Sean King and Mr. Thomas King. *See id.*

II.  *Magellan Insurance Co.*

After engaging Mr. Coomes, Dr. Patel and his assistant, Lindsay Guerrero, completed applications in November 2011 for microcaptive insurance. *Id.* Upon receiving the applications, Mr. Coomes forwarded them to an actuary, Allen Rosenbach of ACR Solutions Group, to purportedly price the premiums for the policies. *Id.* at *9–10. On one occasion, Mr. Coomes and Mr. Rosenbach interviewed Dr. Patel about the applications. *Id.* Mr. Coomes and Mr. Rosenbach identified coverages for the insureds, including OST and ICR. *Id.*

Further, Mr. Coomes created a business plan for the proposed insurance company, Magellan Insurance Co. (Magellan), outlining proposed insurance coverages through the captive. *Id.* at *10. The business plan set forth the purported business rationale for forming the microcaptive including, inter alia, "retaining profits that would otherwise have to be paid to commercial insurers in the form of premiums in excess of the amounts repaid to cover losses." *Id.* The business plan also noted that "[i]t is also intended that [Magellan] will limit its insurance activity to levels where its premiums are not in excess of US $1,200,000 per annum." *Id.* Consistent with the business plan, in Magellan's first year, premiums charged were expected to be in the range of $1,145,000. *Id.*

The record establishes that the business plan was created to serve as justification to form a captive—after the decision had already been made—not to analyze whether a captive was necessary. *See id.* at *11. No person associated with Magellan completed a feasibility study to determine the costs and merits of a captive arrangement for Dr. Patel's businesses. *Id.* Moreover, neither Dr. Patel nor his advisers explored the cost and availability of the same policies on the commercial market. *Id.*

III.  *Decision to Form Second Microcaptive During Increased Scrutiny of Captives Formed by Mr. Coomes*

In February 2015 Dr. Patel's nephew (a tax attorney) emailed him an article about captive insurance companies being a "topic of conversation" for Congress and the IRS, and the nephew noted that captives will "likely be coming under heightened review/scrutiny." *Id.* at *13. Nonetheless, in February 2016, Dr. Patel informed Mr. Fay that he wanted to form a new captive. *Id.* at *12.

The record demonstrates that Dr. Patel's decision to form a new captive was motivated by his desire to retain increased limits on income

tax deductibility. *Id.* In February 2016 Mr. Fay emailed Mr. Sean King, informing him that Dr. Patel wanted to move forward with his new captive that year. *Id.* In that same email Mr. Fay stated that Dr. Patel's accountant had been contacted by the IRS about Dr. Patel's captive. *Id.* The returns of several captives formed by Mr. Coomes were being examined by the IRS. *Id.*

Although Dr. Patel was aware of these IRS examinations, he insisted on forming another captive. *Id.* Emails over the next several months discussed the ownership structure of Magellan and Dr. Patel's anticipated second captive, in no small part for the purpose of determining the new captive's income tax benefits. *Id.* at *12–13.

IV.   *Formation of and Initial Contributions to Plymouth Insurance Co.*

Plymouth Insurance Co. (Plymouth) was formed in December 2016. *Id.* at *13. Plymouth was initially capitalized with $25,000 in cash and a $225,000 Irrevocable Letter of Credit from Dr. Patel. *Id.* at *14. Dr. Patel's advisers stated that he would likely increase his contribution to Plymouth "to approx[imately] $1 million while adding $1.1 million to [the] other captive to meet the 2017 2.1-2.2 million increase"[8] in favorable tax treatment for microcaptives. *Id.*

V.   *Policies Issued by Magellan and Plymouth*

During the tax years at issue, Magellan—and Plymouth in 2016—issued direct written policies to OST and ICR, and SCR (which began in 2015). *Id.* at *14 & n.11. The captive policies fell into several policy categories, including administrative, various business interruption coverages, employment, legal, tax, and special catastrophic risk. *Id.* at *14–18.

But despite obtaining numerous policies through his captives, Dr. Patel continued to purchase insurance coverage with third-party commercial insurers for each of his entities. *Id.* at *25. Such policies insured many of the same risks as the captive policies, including regulatory, malpractice, worker's compensation, automobile, umbrella risks, and general business coverages. *Id.* Commercial premiums ranged between approximately $68,000 and $106,000 per year for the three entities. *Id.* at *29. In contrast, during the same years, Dr. Patel's

---

[8] During the tax years at issue an insurance company with net written premiums (or, if greater, direct written premiums) that did not exceed $1.2 million (or $2.2 million beginning in 2016) for the year could elect to be taxed under section 831(b).

businesses paid premiums to the microcaptives totaling just over $4.5 million. *Id.* Dr. Patel never consulted with his longtime commercial insurance agent about forming a microcaptive, nor did he inquire whether comparable—or even cheaper—coverage was available through commercial carriers. *Id.*

The Patels maintained commercial insurance coverage despite Dr. Patel professing that he has an inherent distrust of commercial insurance. *Id.* Dr. Patel never placed his medical malpractice insurance coverage with his captives, despite also professing that one purpose of forming a microcaptive stemmed from a medical malpractice incident. *Id.*

VI. *Capstone Reinsurance Co., Ltd., and the Purported Reinsurance Program*

In an effort to legitimize the microcaptives he formed, Mr. Coomes formed Capstone Reinsurance Co., Ltd. (Capstone). *Id.* at *9. Microcaptives—including Magellan and Plymouth—participated in a purported risk pool through Capstone via two written agreements: (1) a Reinsurance Agreement and (2) an accompanying Quota Share Retrocession Agreement. *Id.* at *22. These agreements created a circular flow of funds whereby participants paid 51% of their premiums into the pooling arrangement as part of the reinsurance agreement. *Id.* at *23. And in less than a year, they received a significant percentage of funds back as part of the quota share agreement. *Id.*

Magellan and Plymouth were no different. The money they paid under the Capstone agreements created a circular flow of funds such that OST, ICR, and SCR paid funds to Magellan (or Plymouth), those funds were paid to Capstone, and the money then flowed back to Magellan (or Plymouth). *See id.* at *39.

VII. *Premium Pricing*

Premium pricing for Magellan and Plymouth was developed to facilitate favorable income tax treatment for the Patels, not for business purposes. Although Mr. Rosenbach was retained to provide actuarially determined premium pricing, he did not do so. *Id.* at *9–10, *30. Instead, he was flexible in determining premium pricing, changing the premium amounts when requested to do so. *Id.* at *30.

And although the Patels claimed that Mr. Rosenbach developed premium pricing for the captives, the record reveals that Dr. Patel

provided target premiums he wanted to pay. *Id.* at *32. For example, in December 2012 Ms. Guerrero inquired via email: "Dr. Patel wanted to know what the max is that we can pay into the captive." *Id.* at *32–33.

Mr. Rosenbach was aware of the $1.2 million limit on exclusion from taxability under section 831(b), which was later increased to $2.2 million. *Patel II*, T.C. Memo. 2024-34, at *32. The final pricing reports he prepared for Mr. Coomes's clients from 2011 to 2016 did not ever exceed $1.2 million in premiums, which was the maximum deductible amount in those years. *Id.*

Relatedly, in 2014 Ms. Guerrero emailed Mr. Coomes and asked why policy premiums were less than the year before because "Dr. Patel was expecting a little closer to 1.2 million for the both." *Id.* at *33. After Mr. Coomes replied that they should consider adding other coverages or increasing limits the following year—apparently to increase the total amount of insurance premiums Dr. Patel was paying into the captive— Ms. Guerrero informed Mr. Coomes that Dr. Patel wanted to add another company to be insured by the captive in 2015. *Id.* Thus, Magellan began issuing policies to SCR. *Id.* at *14 n.11.

The foregoing facts demonstrate that the purpose of issuing policies through the microcaptives was to drive up premium prices to take advantage of the deductibility of premiums paid to the microcaptives. *See* §§ 162(a), 831(b). The record does not support a finding that the purpose of these transactions was to provide legitimate insurance coverage needs.

VIII. *The Returns, IRS Examination, and Penalty Determinations*

The IRS conducted examinations of the Patels' joint federal income tax returns and issued NODs[9] for the tax years at issue. *Patel II*, T.C. Memo. 2024-34, at *34. In brief, the NOD for 2013 disallowed the deductions for insurance expenses because of a lack of economic substance, while the NODs for 2014 through 2016 determined a disallowance of deductions for reasons other than the economic substance doctrine. Specifically, the NODs for the tax years at issue made the following determinations:

---

[9] On August 25, 2017, the IRS issued an NOD for tax year 2013. In addition, on March 15, 2018, the IRS issued an NOD for tax year 2014. Finally, on September 25, 2018, the IRS issued an NOD for tax years 2015 and 2016.

- **2013**: Deductions for insurance expenses were disallowed on account of a lack of economic substance and, in the alternative, because the expenses were not ordinary and necessary.

- **2014**: Deductions for "Other Expenses" (Sch. E1) and other items were disallowed on account of a "lack of substantiation."

- **2015 and 2016**: Deductions for "Legal and Other Professional Fees" (Sch. E1) and "Other Expenses" (Sch. C2) were disallowed because the expenses were not ordinary and necessary. On the same page, deductions for "Other Expenses" (Sch. E1) were disallowed due to a lack of substantiation. For one set of disallowed expenses (Sch. E-Inc/Loss-Prtnrship/S Corps-Passve/Non-Passve), the NOD refers the reader to "Exhibit A" for more details regarding the adjustments. It provides that the relevant adjustments were made due to lack of substantiation, but makes no comment about a lack of economic substance.

The IRS also determined the following penalties for the tax years at issue, which we reserved for this Opinion:

| Year | Penalty § 6662 |
|------|------|
| 2013 | $99,157 |
| 2014 | 96,884 |
| 2015 | 95,037 |
| 2016 | 105,990 |

*See Patel I*, T.C. Memo. 2020-133, at \*2. For tax year 2013, the accuracy-related penalty in the 2013 NOD was determined pursuant to section 6662(b)(6) and (i) and, in the alternative, pursuant to section 6662(b)(1) and (2). *See Patel I*, T.C. Memo. 2020-133, at \*6. For tax years 2014 through 2016, accuracy-related penalties in the respective NODs were determined pursuant to section 6662(a) and (b)(1), (2), and (6). *Patel I*, T.C. Memo. 2020-133, at \*8, \*11.

IX.  *Tax Court Proceedings*

Petitions to this Court followed the IRS's determinations. The relevant Answers filed by respondent relating to tax years 2014 through 2016 asserted that deductions were disallowed because of the economic substance doctrine. Further, as set forth in respondent's various Answers for tax years 2014 through 2016, the IRS determined increased penalties under section 6662(i).

In *Patel II*, T.C. Memo. 2024-34, at *51, we held that Magellan's and Plymouth's purported captive transactions did not constitute insurance because they failed to distribute risk. We also held that, in the alternative, the Patels' microcaptives did not act as an insurer commonly would. *Id.*

In the Order issued pursuant to *Patel I*, T.C. Memo. 2020-133, at *27, the Court granted in part the Patels' Motion for Partial Summary Judgment related to penalties. In relevant part, we held that respondent's agent failed to satisfy the supervisory approval requirement set forth in section 6751(b)(1) with respect to the penalties under section 6662(b)(2) and (6), as well as the increased rate under section 6662(i), for tax year 2013. *Patel I*, T.C. Memo. 2020-133, at *27. In addition, in respondent's Seriatim Answering Brief, respondent concedes the increased rate under section 6662(i) for tax year 2016.

Thus, the last issue for us to decide is whether the Patels are subject to accuracy-related penalties, as limited by *Patel I*, T.C. Memo. 2020-133, at *27. After concessions and our prior ruling regarding section 6751(b), the following section 6662(a) accuracy-related penalties for 2013 through 2016 are at issue:

| Year | Penalties at Issue |
|------|---------------------|
| 2013 | § 6662(b)(1) |
| 2014 | § 6662(b)(1), (b)(2), (b)(6), and (i) |
| 2015 | § 6662(b)(1), (b)(2), (b)(6), and (i) |
| 2016 | § 6662(b)(1), (b)(2), and (b)(6) |

OPINION

I.    *Burden of Proof*

Before turning to the penalties at issue, we first examine the burden of proof. Section 7491(c) generally provides that "the Secretary shall have the burden of production in any court proceeding with respect to the liability of any individual for any penalty." This burden typically requires the Commissioner to come forward with sufficient evidence indicating that the imposition of the relevant penalty is appropriate. *See Higbee v. Commissioner*, 116 T.C. 438, 446 (2001).

Once the Commissioner satisfies his burden of production, the burden of proof is on the taxpayer to "come forward with evidence sufficient to persuade a Court that the Commissioner's determination is incorrect." *Id.* at 447. However, where the Commissioner asserts a new

matter, such as a penalty, in an answer (rather than in the NOD), the Commissioner bears the full burden of proof regarding the penalty, including the taxpayer's lack of reasonable cause or any other applicable affirmative defense. *See* Rule 142(a)(1); *Estate of Hoensheid v. Commissioner*, T.C. Memo. 2023-34, at \*47; *Full-Circle Staffing, LLC v. Commissioner*, T.C. Memo. 2018-66, at \*42–43, *aff'd in part, appeal dismissed in part*, 832 F. App'x 854 (5th Cir. 2020).

On February 24, 2022, the Patels filed a Motion to Shift the Burden of Proof to Respondent (Docket No. 24344-17, Doc. 173), seeking to shift the burden of proof on all issues to respondent.[10] Respondent filed an Objection to Motion to Shift the Burden of Proof, generally objecting to the blanket shift (Docket No. 24344-17, Doc. 188). However, respondent acknowledged that he bears the burden of proof with respect to whether the microcaptive arrangements lacked economic substance.[11] This is consistent with respondent's statement in his Motion for Leave to File First Amendment to Answer (Docket No. 11352-18, Doc. 5).

Thus, respondent will bear the burden of proof with respect to (1) the disallowance of claimed benefits on the grounds of lack of economic substance and (2) the section 6662(i) increased penalties asserted for the first time in an Answer.[12] *See* Rule 142(a)(1); *Estate of Hoensheid*, T.C. Memo. 2023-34, at \*47. The Patels will bear the burden

---

[10] The Patels' blanket request to shift the burden of proof did not specifically reference the economic substance doctrine, although it did reference "all new matters pled" and penalties in respondent's Answer (Docket No. 24344-17, Doc. 173, at 3).

[11] Because of respondent's concession, we need not decide whether the disallowance of claimed tax benefits on the grounds of lack of economic substance is a "new matter" as opposed to a theory consistent with an assertion of penalties under the codified economic substance doctrine. *See, e.g.*, *Blau v. Commissioner*, 924 F.3d 1261, 1280 (D.C. Cir. 2019) ("If a defense to a new matter 'is completely dependent upon the same evidence,' . . . as a defense to the penalty originally asserted, then there is no practical significance to shifting the burden of proof." (quoting *Shea v. Commissioner*, 112 T.C. 183, 197 n.22 (1999))), *aff'g RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1 (2017); *Hutchinson v. Commissioner*, 116 T.C. 172, 182 (2001) (quoting *Wayne Bolt & Nut Co. v. Commissioner*, 93 T.C. 500, 507 (1989)) (observing that new theories that simply supplement previously raised issues are not treated as new matters); *Shea*, 112 T.C. at 191 ("When the Commissioner attempts to rely on a basis that is beyond the scope of the original deficiency determination, the Commissioner must generally assume the burden of proof as to the new matter.").

[12] Regardless of who bears the burden of proof, there is ample support in the record demonstrating that the purported microcaptive arrangements lacked economic substance. *See infra* Opinion Part II.D.

of proof with respect to the remainder of the penalties that were determined in the relevant NODs.

Having determined who bears the burden of proof, we will next address whether the Patels are liable for accuracy-related penalties. Section 6662(a) imposes a 20% penalty on the portion of an underpayment of tax attributable, in relevant part, to (i) the disallowance of claimed tax benefits by reason of a transaction lacking economic substance (section 6662(b)(6)); (ii) any substantial understatement of income tax (section 6662(b)(2)); or (iii) negligence or disregard of rules or regulations (section 6662(b)(1)). We will first analyze the parties' arguments regarding section 6662(b)(6) and (i) before turning to section 6662(b)(1) and (2). Then, we will examine whether the Patels have any defenses to accuracy-related penalties.

II. *Transaction Lacking Economic Substance*

Section 6662(a) and (b)(6) imposes an accuracy-related penalty on the portion of an underpayment of tax required to be shown on a return attributable to the disallowance of claimed tax benefits by reason of a transaction lacking economic substance within the meaning of section 7701(o), which codifies the economic substance doctrine.[13] We will first briefly address how the economic substance doctrine has developed in caselaw. Then we will turn to codification of the economic substance doctrine and its application. And, finally, we will turn to application in these cases.

A. *Brief History of the Economic Substance Doctrine*

The economic substance doctrine has developed in common law over the last 90 years, *see Coltec Indus., Inc. v. United States*, 454 F.3d 1340, 1352 (Fed. Cir. 2006), since the U.S. Supreme Court decided *Gregory v. Helvering*, 293 U.S. 465 (1935). In *Gregory* the Supreme Court disregarded a transaction that complied with the literal terms of the

---

[13] In *Patel II*, T.C. Memo. 2024-34, at *52, we sustained respondent's disallowance of deductions on the ground that the transactions failed to constitute insurance for federal tax purposes. That opinion was silent as to whether the transactions lacked economic substance as that determination was not necessary to resolve the disallowance of the deductions. *PDK Laboratories Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part) ("[T]he cardinal principle of judicial restraint—if it is not necessary to decide more, it is necessary not to decide more—counsels us to go no further."). Following the issuance of *Patel II*, the Court inquired whether the parties could reach an agreement regarding the penalties (Docket No. 24344-17, Doc. 364). They could not (*Id.* Doc. 365).

Code, where the taxpayer—solely to avoid a tax—transferred stock to a new corporation, which then transferred the stock directly to the taxpayer. *Id.* at 469–70. In reaching its decision the Supreme Court observed that "[t]he legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." *Id.* at 469. Nonetheless, the Court went on to rule against the taxpayer, stating that although the transactions at issue were "conducted according to the terms of [the Code], [the transactions were] in fact an elaborate and devious form of conveyance masquerading as a corporate reorganization, and nothing else." *Id.* at 470.

Ten years later, the Supreme Court once again disregarded a transaction in which the taxpayer—to avoid a large corporate income tax—transferred an asset in the form of a dividend to two shareholders who in turn conveyed the asset to a purchaser who had originally negotiated with the corporation to purchase the asset. *Commissioner v. Ct. Holding Co.*, 324 U.S. 331, 333–34 (1945). For the next several decades, the Supreme Court continued to embrace principles of economic substance. *See, e.g.*, *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84 (1978) (allowing a transaction because it was a "genuine multiple-party transaction with economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached"); *Knetsch v. United States*, 364 U.S. 361, 364–66 (1960) (denying an interest deduction on a transaction that lacked economic substance and holding that "there was nothing of substance to be realized by [the taxpayer] from this transaction beyond a tax deduction").

Jurisprudence regarding the economic substance doctrine also developed in this Court, driven by the circuit where an appeal would presumptively lie. *See, e.g.*, *Daichman v. Commissioner*, T.C. Memo. 2020-126, at \*17 (citing *Golsen v. Commissioner*, 54 T.C. 742 (1970), *aff'd*, 445 F.2d 985 (10th Cir. 1971)) (noting that "the Court follows the law of that circuit with respect to its interpretation of the economic substance doctrine" and, as appropriate in that case, relying on the law of the U.S. Court of Appeals for the Fifth Circuit). Courts of appeals followed various tests, but they typically examined the transactions in the light of the following two tests: (1) whether the transaction had economic substance beyond tax benefits (objective test) and (2) whether the taxpayer had a nontax business purpose for entering the disputed transaction (subjective test). *Gerdau Macsteel, Inc. v. Commissioner*, 139

T.C. 67, 168–71 (2012) (examining how various courts of appeals applied the economic substance doctrine).

But courts of appeals disagreed about the weight to be given to these tests. *Id.* at 169–70. Some courts, like the Fifth Circuit, applied a conjunctive test in which a transaction would be respected only if it had objective economic effects other than tax savings *and* a nontax business purpose. *See, e.g.*, *Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 544 (5th Cir. 2009) (adopting a multifactor test for analyzing whether a transaction lacks economic substance). Other courts employed a disjunctive test, requiring either an objective potential for profit *or* a nontax business purpose. *See Endeavor Partners Fund, LLC v. Commissioner*, T.C. Memo. 2018-96, at *50–51 (noting that various courts of appeals applied different tests and applying the test of the court to which appeal of the case would lie), *aff'd*, 943 F.3d 464 (D.C. Cir. 2019). A third group of courts examined various factors deemed relevant to a determination concerning economic substance. *See, e.g.*, *Reddam v. Commissioner*, 755 F.3d 1051, 1060 (9th Cir. 2014) (observing that the economic substance doctrine does not follow a rigid two-part test (citing *Sacks v. Commissioner*, 69 F.3d 982, 988 (9th Cir. 1995), *rev'g and remanding* T.C. Memo. 1992-596)), *aff'g* T.C. Memo. 2012-106.

B.    *Codification of the Economic Substance Doctrine*

After years-long development in caselaw, Congress codified the economic substance doctrine in 2010 as section 7701(o). *See* Health Care and Education Reconciliation Act of 2010 (Act), Pub. L. No. 111-152, § 1409(a), 124 Stat. 1029, 1067; *see also Gerdau Macsteel, Inc.*, 139 T.C. at 168 n.68 (observing that Congress codified the economic substance doctrine). In relevant part, section 7701(o) provides:

Sec. 7701(o). Clarification of economic substance doctrine.—
(1) Application of doctrine.—In the case of any transaction to which the economic substance doctrine is relevant, such transaction shall be treated as having economic substance only if—
(A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and

(B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

. . . .

(5) Definitions and special rules.—For purposes of this subsection–

(A) Economic substance doctrine.—The term "economic substance doctrine" means the common law doctrine under which tax benefits under subtitle A with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose.

(B) Exception for personal transactions of individuals.—In the case of an individual, paragraph (1) shall apply only to transactions entered into in connection with a trade or business or an activity engaged in for the production of income.

(C) Determination of application of doctrine not affected.—The determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted.

(D) Transaction.—The term "transaction" includes a series of transactions.

The Act also added section 6662(b)(6), which imposes a 20% penalty on the portion of an underpayment of tax required to be shown on a return that is attributable to any disallowance of claimed tax benefits by reason of a transaction lacking economic substance within the meaning of section 7701(o). *See also* Act § 1409(b), 124 Stat. at 1068.

C.    *Application of the Codified Economic Substance Doctrine*

This is the Court's first opportunity to examine when the codified economic substance doctrine applies. Section 6662(b)(6) applies the accuracy-related penalty to any disallowance of claimed tax benefits by reason of a transaction lacking economic substance within the meaning of section 7701(o). And as noted above, section 7701(o)(1) requires application of the economic substance doctrine "[i]n the case of any

transaction *to which the economic substance doctrine is relevant.*" (Emphasis added.) We will first address whether section 7701(o) requires a relevancy determination.

### 1. *Statutory Interpretation*

### a. *Statutory Text*

"Statutory interpretation . . . always . . . begins with the text." *Ross v. Blake*, 578 U.S. 632, 638 (2016). The text before us is section 7701(o), which states in no uncertain terms that it applies to "transaction[s] to which the economic substance doctrine is relevant." § 7701(o)(1). It further states that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if this subsection had never been enacted." § 7701(o)(5).

Faced with these provisions, we easily conclude that the statute requires a relevancy determination. To put it plainly—the statute says so, right there, on its face. First, section 7701(o)(1) signals that a determination is required by conditioning application of the doctrine on certain circumstances—namely, the doctrine applies *if* there is a transaction to which it is relevant. Next, section 7701(o)(5) expressly directs us to make the determination (whether the doctrine is relevant) and, if that were not enough, the same provision explains *how* to make the determination (as if the statute had never been enacted). In short, Congress could hardly have been clearer, at least on this narrow point.

This same text tells us that the relevancy determination is not coextensive with the two-part test set forth in section 7701(o)(1)(A) and (B).[14] Congress specifically provided in the introductory sentence of section 7701(o)(1) that the two-part test applies only "[i]n the case of any transaction to which the economic substance doctrine is relevant." Conflating the relevancy determination with the two-part test would ignore that direction and deprive the statute's reference to relevance of independent meaning. And, of course, "[i]t is our duty 'to give effect, if possible, to every clause and word of a statute.'" *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (quoting *United States v. Menasche*, 348 U.S. 528,

---

[14] In the light of the text, we respectfully disagree with other courts that have held that the relevancy requirement is coextensive with the requirements of section 7701(o)(1)(A) and (B). *See, e.g.*, *Liberty Glob., Inc. v. United States*, No. 20-cv-63501, 2023 WL 8062792 (D. Colo. Oct. 31, 2023); *see also Chemoil Corp. v. United States*, No. 19-cv-6314, 2023 WL 6257928, at *5 (S.D.N.Y. Sept. 26, 2023).

538–39 (1955)); *see also Polselli v. IRS*, 143 S. Ct. 1231, 1238 (2023) (observing that courts "giv[e] effect to every clause and word of a statute" (alteration in original) (quoting *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 106 (2011))). We are thus "'reluctan[t] to treat statutory terms as surplusage' in any setting." *Walker*, 533 U.S. at 174 (quoting *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698 (1995)); *accord* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174, 176 (2012) ("Because legal drafters should not include words that have no effect, courts avoid a reading that renders some words altogether redundant."). And we do not read words out of statutes. *See United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 273 (1931) ("[I]t is not within the judicial province to read out of the statute the requirement of its words." (citing *Rand v. United States*, 249 U.S. 503, 510 (1919))).

b.     *Legislative History*

"For those who consider legislative history relevant," *Warger v. Shauers*, 574 U.S. 40, 48 (2014), the legislative history of the codified economic substance doctrine is fully consistent with our interpretation that section 7701(o)(1) requires a relevancy determination, *see, e.g.*, *Church of Scientology of Cal. v. IRS*, 792 F.2d 153, 162 n.4 (D.C. Cir. 1986) (Scalia, J.) ("Legislative history is used to clarify the meaning of a text, not to create extra-statutory law."), *aff'd*, 484 U.S. 9 (1987). Observing the lack of uniformity in the application of the economic substance doctrine, *see* H.R. Rep. No. 111-443(I), at 293–95 (2010), *as reprinted in* 2010 U.S.C.C.A.N. 123, 224–28, the committee expressed its intent "to provide greater clarity and uniformity in the application of the economic substance doctrine in order to improve its effectiveness at deterring unintended consequences," *id.* at 295, 2010 U.S.C.C.A.N. at 228.

Further, the House report made clear that the economic substance doctrine does not apply to every transaction. *Id.* at 296, 2010 U.S.C.C.A.N. at 228–29 (providing a nonexhaustive list of transactions to which the doctrine does not apply). The House report stated that the codified economic substance doctrine applies "in the case of any transaction to which the economic substance doctrine is relevant" and that "[t]he determination of whether the economic substance doctrine is relevant to a transaction shall be made in the same manner as if the provision had never been enacted." *Id.* at 295, 2010 U.S.C.C.A.N. at 228. The House report also confirms that "the provision does not change current law standards in determining *when* to utilize an economic

substance analysis." *Id.* at 295–96, 2010 U.S.C.C.A.N. at 228 (emphasis added). Thus, the legislative history confirms that the codified economic substance doctrine is not intended to apply to every transaction and may be applied only when it is "relevant."

Having determined that section 7701(o) requires a relevancy determination, we turn to the content of that requirement. There too Congress has answered the question by directing courts to the existing application of the doctrine.

### 2. *The Economic Substance Doctrine in the Insurance Context*

As noted *supra* Opinion Part II.A, the economic substance doctrine has developed over the last 90 years. Our survey of caselaw revealed a variety of circumstances in which the doctrine has been applied. This includes, as relevant here, cases involving insurance transactions and, in particular, captive insurance transactions. *See Malone & Hyde, Inc., & Subs. v. Commissioner*, 62 F.3d 835 (6th Cir. 1995) (captive insurance), *rev'g and remanding* T.C. Memo. 1993-585; *see also, e.g.*, *Knetsch*, 364 U.S. 361 (deferred annuity savings bonds); *Dow Chem. Co. v. United States*, 435 F.3d 594, 600–05 (6th Cir. 2006) (corporate-owned life insurance); *IRS v. CM Holdings, Inc.* (*In re CM Holdings, Inc.*), 301 F.3d 96, 102–07 (3d Cir. 2002) (corporate-owned life insurance); *Salley v. Commissioner*, 464 F.2d 479 (5th Cir. 1972) (individual-owned life insurance), *aff'g* 55 T.C. 896 (1971); *Golsen v. Commissioner*, 445 F.2d 985 (individual-owned life insurance); *Winn-Dixie Stores, Inc. & Subs. v. Commissioner*, 113 T.C. 254 (1999) (corporate-owned life insurance), *aff'd per curiam*, 254 F.3d 1313 (11th Cir. 2001).[15]

---

[15] In some other cases, courts analyzed the economic substance of a transaction and determined that the requirements of the economic substance doctrine were satisfied. Those cases also reflect the relevance of the doctrine, even though the transactions at issue were not recharacterized under the doctrine. *See United Parcel Serv. of Am., Inc. v. Commissioner*, 254 F.3d 1014, 1020 (11th Cir. 2001) ("We therefore conclude that UPS's restructuring of its excess-value business had both real economic effects and a business purpose, and it therefore under our precedent had sufficient economic substance to merit respect in taxation."), *aff'g* T.C. Memo. 1999-268; *Humana Inc. v. Commissioner*, 881 F.2d 247, 255–56 (6th Cir. 1989) (holding that the Tax Court had misapplied the economic substance doctrine by recharacterizing a transaction "absent a finding of sham or lack of business purpose under the relevant tax statute"), *aff'g in part, rev'g in part and remanding* 88 T.C. 197 (1987); *Rent-A-Center, Inc. v.*

In *Malone & Hyde*, the closest case to those before us, the taxpayer was a corporation that established an insurance subsidiary in Bermuda to reinsure selected risks. The taxpayer capitalized its Bermuda subsidiary with just $120,000 and then entered into primary insurance contracts with a third party insurer (Northwestern). The taxpayer arranged for Northwestern to enter into reinsurance contracts with the taxpayer's Bermuda subsidiary. Because the Bermuda subsidiary was thinly capitalized, the taxpayer executed a hold-harmless agreement stating that, if the Bermuda subsidiary defaulted on any of its reinsurance obligations, the taxpayer would shield Northwestern from any resulting liability.

The taxpayer paid insurance premiums to Northwestern, which in turn paid on a portion of the premiums to the Bermuda subsidiary. The taxpayer deducted the full amount of the premiums it paid to Northwestern on its tax returns, thus claiming deductions for amounts ultimately received by its Bermuda subsidiary as reinsurance premiums.

The Commissioner challenged the taxpayer's deductions for the portion of the insurance premiums received and paid on to its Bermuda subsidiary. Relying on a prior decision of the U.S. Court of Appeals for the Sixth Circuit, our Court found for the taxpayer, explaining that "[t]he Sixth Circuit in *Humana* criticized this Court for misapplying the 'substance over form' analysis, absent a finding of sham or lack of business purpose." *Malone & Hyde, Inc. & Subs. v. Commissioner*, T.C. Memo. 1993-585, 1993 WL 516207, at \*9 (citing *Humana Inc. v. Commissioner*, 881 F.2d at 254–55), *supplementing* T.C. Memo. 1989-604. But the Sixth Circuit reversed our decision, explaining as follows:

> This court clearly applied the *Le Gierse* analysis in *Humana*. But it did so only after finding that Humana's use of a Colorado captive insurance company was not a sham and that it served a legitimate business purpose.
> We believe the tax court put the cart before the horse in this case. It should have determined first whether [the taxpayer] created [the Bermuda subsidiary] for a legitimate business purpose or whether the captive was in fact a sham corporation. A taxpayer is "free to arrange his

*Commissioner*, 142 T.C. 1, 10–13 (2014) (observing that "[w]e respect the separate taxable treatment of a captive unless there is a finding of sham or lack of business purpose" and holding that the taxpayer's captive insurance corporation was not a sham and was created for significant and legitimate nontax reasons).

> financial affairs to minimize his tax liability." *Estate of Stranahan v. C.I.R.*, 472 F.2d 867, 869 (6th Cir.1973). Thus, "the presence of tax avoidance motives will not nullify an otherwise bona fide transaction." *Id*. However, the establishment of a tax deduction is not, in and of itself, an "otherwise bona fide transaction" if the deduction is accomplished through the use of an undercapitalized foreign insurance captive that is propped-up by guarantees of the parent corporation. The captive in such a case is essentially a sham corporation, and the payments to such a captive that are designated as insurance premiums do not constitute bona fide business expenses, entitling the taxpayer to a deduction under § 162(a).

*Malone & Hyde, Inc., & Subs. v. Commissioner*, 62 F.3d at 840; *see also* § 7701(o)(5)(A) ("The term 'economic substance doctrine' means the common law doctrine under which tax benefits under subtitle A with respect to a transaction are not allowable if the transaction does not have economic substance or lacks a business purpose."); *United Parcel Serv. of Am., Inc. v. Commissioner*, 254 F.3d at 1018 ("This economic-substance doctrine, also called the sham-transaction doctrine, provides that a transaction ceases to merit tax respect when it has no 'economic effects other than the creation of tax benefits.'" (quoting *Kirchman v. Commissioner*, 862 F.2d 1486, 1492 (11th Cir. 1989), *aff'g Glass v. Commissioner*, 87 T.C. 1087 (1986))); *N. Ind. Pub. Serv. Co. v. Commissioner*, 115 F.3d 506, 512 (7th Cir. 1997) (noting that the Commissioner had cited *Malone & Hyde* and other captive insurance cases as showing "that even legitimate corporations may engage in transactions lacking economic substance and that the Commissioner may disregard transactions between related legitimate corporations" and explaining that the cases "allow the Commissioner to disregard transactions which are designed to manipulate the Tax Code so as to create artificial tax deductions"), *aff'g* 105 T.C. 341 (1995).

The parallels between *Malone & Hyde* and the cases before us are easy to draw. And we perceive no mitigating factors in these cases that would argue for a different approach from the one we and the courts of appeals have previously taken. Therefore, heeding Congress's direction that we proceed in the same manner as if section 7701(o) had never been enacted—to determine whether the economic substance doctrine is

relevant to a transaction—we conclude that the doctrine is relevant to these cases.[16]

### 3. *The Patels' Argument That They Were "Congressionally Induced"*

Before we apply subparagraphs (A) and (B) of section 7701(o)(1), it is worthwhile to address the Patels' argument that the economic substance doctrine does not apply when the taxpayer has engaged in a purported "Congressionally induced" or "Congressionally incentivized" transaction. Citing *Sacks v. Commissioner*, 69 F.3d at 992, and *Cross Refined Coal, LLC v. Commissioner*, 45 F.4th 150, 158 (D.C. Cir. 2022), the Patels argue that "the judicial doctrine [of economic substance] also excludes policy-based Congressional inducements like this small captive insurance arrangement."

As a starting point, it is already well established that the economic substance doctrine applies to insurance arrangements. *See supra* Opinion Part II.C.2. This alone would be sufficient reason to reject the Patels' argument.

Even if we were to overlook the existing precedent applying the economic substance doctrine to insurance arrangements, the Patels' argument would fail because their reliance on *Sacks* and *Cross Refined Coal* is misplaced. The "inducement" cited by the Patels is the tax treatment of insurers under section 831(b). For small insurers, section 831(b) imposes tax on investment income in lieu of taxable income as otherwise defined in section 832. But the primary issue in these cases is the deductibility of purported insurance premiums reported as ordinary and necessary business expenses under section 162. Further, we previously concluded that the premiums paid and deducted by the Patels did not constitute insurance for federal tax purposes. *Patel II*, T.C. Memo. 2024-34, at *51. The Patels do not direct us to any congressional inducement to claim deductions for premiums for purported insurance that is not, in fact, insurance.

---

[16] We understand Congress's direction to mean that, among other things, courts have the same flexibility to identify relevant contexts for application of the codified doctrine as they possessed before codification. § 7701(o)(5)(C); H.R. Rep. No. 111-443(I), at 295, 2010 U.S.C.C.A.N. at 228 ("The provision provides a uniform definition of economic substance, but does not alter the flexibility of the courts in other respects.").

Once the relevancy question is answered in the affirmative, we then examine the transaction by applying the two-part test outlined by Congress:

> (A) the transaction changes in a meaningful way (apart from Federal income tax effects) the taxpayer's economic position, and
> (B) the taxpayer has a substantial purpose (apart from Federal income tax effects) for entering into such transaction.

§ 7701(o)(1). We will now turn to analyzing the Patels' transactions in the light of our determination.

D. *Application of Section 7701(o) to the Patels' Microcaptives*

1. *Objective Test: Change in Economic Position*

First, we examine whether the transactions at issue changed in a meaningful way (apart from federal income tax effects) the taxpayer's economic position. *See* § 7701(o)(1)(A). "[T]ransactions lack objective economic reality if they 'do not vary[,] control[,] or change the flow of economic benefits.'" *Southgate Master Fund, L.L.C. ex rel. Montgomery Cap. Advisors, LLC v. United States*, 659 F.3d 466, 481 (5th Cir. 2011) (alterations in original) (quoting *Klamath Strategic Inv. Fund*, 568 F.3d at 543). "This is an objective inquiry into whether the transaction either caused real dollars to meaningfully change hands or created a realistic possibility that they would do so." *Id.* (footnote omitted). Moreover, "a circular flow of funds among related entities does not indicate a substantive economic transaction for tax purposes." *Merryman v. Commissioner*, 873 F.2d 879, 882 (5th Cir. 1989), *aff'g* T.C. Memo. 1988-72.

The transactions here did not result in a meaningful change in economic position with respect to insurance. As noted more fully in *Patel II*, the transaction involving Capstone, Magellan, and Plymouth involved a circular flow of funds such that money paid into Capstone was returned—in substantial part—to Magellan and Plymouth. *Patel II*, T.C. Memo. 2024-34, at *23–25; *see also supra* Findings of Fact Part VI. Dr. Patel maintained ownership of Magellan and Plymouth, except to the extent that he transferred ownership of these entities to his children

so that assets would pass outside of his taxable estate. *Patel II*, T.C. Memo. 2024-34, at *11–14.[17]

Further, Dr. Patel paid unreasonable and excessive premiums, up to the amount allowed by section 831(b), while maintaining his commercial insurance coverage. *See, e.g.*, *Patel II*, T.C. Memo. 2024-34, at *27, *29, *31; *see also supra* Findings of Fact Parts V and VII. Specifically, Dr. Patel's businesses paid premiums to the microcaptives totaling just over $4.5 million while commercial premiums ranged between approximately $68,000 and $106,000 per year for the three entities during those same years. *See supra* pp. 7–8 (citing *Patel II*, T.C. Memo. 2024-34, at *29). Accordingly, we hold that the transactions at issue did not meaningfully change the Patels' economic position, aside from federal tax effects. *See Southgate*, 659 F.3d at 481.

### 2. *Subjective Test: Tax Avoidance*

The Patels' failure of the objective test is sufficient to conclude that the transactions at issue lack economic substance. However, for the sake of completeness, *see Tooke v. Commissioner*, 164 T.C. 16, 34 n.11 (2025) (citing *Mukhi v. Commissioner*, 163 T.C. 150, 162 (2024), *supplementing* 162 T.C. 177 (2024)), we will examine whether the Patels had a substantial purpose (apart from federal income tax effects) for entering into the microcaptive arrangements, *see* § 7701(o)(1)(B). Considering the totality of the facts and circumstances in evidence, we cannot conclude that the Patels possessed the requisite "substantial purpose."

To begin, Dr. Patel orchestrated the operations of Magellan and Plymouth to maximize income tax deductions without regard to insurance and business principles. How do we know? Mr. Rosenbach did not provide actuarially determined policy premiums. *See supra* pp. 8–9. To the contrary, he changed the premium amounts when requested to do so. *See supra* p. 8. We further note that Dr. Patel provided target premiums he wanted to pay, focusing on the maximum amounts he could pay into the captive. *See supra* pp. 8–9 (citing *Patel II*, T.C. Memo. 2024-34, at *32). Those maximums coincided with the relevant limit

---

[17] Because the issues before the Court relate only to the imposition of penalties resulting from the Patels' claim of income tax deductions under section 162, this Opinion does not address the estate tax. *See* §§ 2001–2801. The Patels did not argue that their estate planning objective gave their microcaptive arrangement economic substance; we likewise restrict our analysis to the microcaptive transaction and its income tax effects.

provided by section 831(b), and Mr. Rosenbach was aware of the ceiling. *Patel II*, T.C. Memo. 2024-34, at *32–33; *see supra* pp. 8–9.

We cannot overlook the fact that Magellan's and Plymouth's premiums were not set by actuarial principles, but by their only customer whose expressed interest was in paying the maximum deductible amount. *Patel II*, T.C. Memo. 2024-34, at *32–33; *see supra* pp. 8–9. While we observe the oddity of a purported customer seeking to maximize his expense, we also observe that Dr. Patel sat on both sides of the transactions, doubling as Magellan's and Plymouth's sole customer and founder. *Patel II*, T.C. Memo. 2024-34, at *2, *10–11, *13–14. These facts and circumstances undermine the Patels' claim that they possessed a "substantial purpose" for the transactions apart from federal income tax effects.

We also note evidence showing Dr. Patel's focus on income tax benefits when he decided to form Plymouth, his second microcaptive. Even though he was aware of the IRS examination of Magellan and other captives formed by Mr. Coomes, he insisted on forming another captive. *See supra* p. 6 (citing *Patel II*, T.C. Memo. 2024-34, at *12). Emails over the next several months discussed the ownership structure of Magellan and Dr. Patel's anticipated second captive, in no small part for the purpose of determining the new captive's income tax benefits. *See supra* pp. 6–7 (citing *Patel II*, T.C. Memo. 2024-34, at *12–13).

The record consistently reveals Dr. Patel's intent to maximize income tax deductions through his formation of Magellan and Plymouth. To the extent the Patels contend that they had a business purpose—and that it was substantial—the evidence does not support their position.[18]

Dr. Patel's answers on the financial feasibility study did not address captive insurance or the need for insurance products. *See supra* p. 4 (citing *Patel II*, T.C. Memo. 2024-34, at *8). We also note that no person associated with Magellan completed a cost or feasibility study to

---

[18] Under precodification caselaw, this subjective test was "a subjective inquiry into 'whether the taxpayer was motivated by profit to participate in the transaction.' Tax-avoidance considerations are not wholly prohibited; taxpayers who act with mixed motives, seeking both tax benefits and profits for their businesses, can satisfy the business-purpose test." *Southgate*, 659 F.3d at 481–82 (footnote omitted) (quoting *Dow Chem. Co.*, 435 F.3d at 599). In the pre-codification context, the presence of a legitimate business purpose to a taxable event was enough to satisfy the tax-avoidance test in the Fifth Circuit. *Id.* Nevertheless, a transaction could still lack economic substance if the objective test—whether the transaction resulted in a meaningful change to the taxpayer's economic position (apart from federal income tax effects)—was not satisfied.

determine the costs and merits of a captive arrangement for Dr. Patel's businesses. *See supra* p. 6 (citing *Patel II*, T.C. Memo. 2024-34, at *11).

In addition, the business plan for Magellan was created to serve as justification to form a captive—after the decision had already been made—not to analyze whether a captive was necessary. *See supra* p. 6 (citing *Patel II*, T.C. Memo. 2024-34, at *11). Furthermore, many of the contemporaneous emails exchanged during the tax years at issue contain suggestions that the purpose of forming a captive was to reduce income taxes, not increase insurance protection. *See supra* p. 5 (citing *Patel II*, T.C. Memo. 2024-34, at *7–8) (quoting Mr. Fay's email describing Dr. Patel as "the MD paying almost 2.5M in income taxes" who "did his own research on [microcaptive insurance companies]," and "wants to talk with Sean [King] about doing potentially 2 [captive insurance companies]").

Notwithstanding the facts and circumstances related to captive formation, other facts and circumstances indicate that the Patels were keenly interested in maximizing their income tax deductions. Dr. Patel continued to purchase commercial insurance policies that insured many of the same risks that the captive policies purported to cover; eliminating overlapping policies would have lowered his deductions. *See supra* p. 7 (citing *Patel II*, T.C. Memo. 2024-34, at *25). Also, Dr. Patel never placed his medical malpractice insurance coverage with his captives, despite professing that he has an inherent distrust of commercial insurance and that one purpose of forming a microcaptive was to prevent a recurrence of his experience with a medical malpractice incident. *See supra* p. 8 (citing *Patel II*, T.C. Memo. 2024-34, at *29).

As we have discussed at length, the evidence demonstrates that the Patels entered into the microcaptive transactions to reduce their federal income tax bill, not for any business purpose. This evidence includes, but is not limited to, the Patels and their entities (1) paying excessively high premiums designed to maximize deductions; (2) demonstrating through overwhelming contemporaneous emails and documents that the microcaptives served no legitimate business purpose; and (3) maintaining commercial insurance during the tax years at issue, for significantly lower premiums, which often covered the same risks as the microcaptives. *See, e.g.*, *Patel II*, T.C. Memo. 2024-34, at *11, *29, *32; *supra* pp. 3–11. Accordingly, we cannot conclude that the Patels had a "substantial purpose" for the transaction apart from federal income tax effects. *See* § 7701(o)(5)(D) (providing that the term "transaction" includes a series of a transactions).

E.     *Application of Section 6662(b)(6)*

Because the ongoing dispute about the section 6662(b)(6) penalty requires us to decide whether there is a "transaction lacking economic substance (within the meaning of section 7701(o))," we have reached and resolved that issue. *See supra* Opinion Part II.C and D. For the reasons discussed, we concluded that the purported insurance transactions are "transaction[s] lacking economic substance (within the meaning of section 7701(o))." *See supra* Opinion Part II.C and D.

Next, we must examine whether the section 6662(b)(6) penalty applies in the light of our holding that the transactions lack economic substance. The introductory clause of section 6662(b) provides that the section "shall apply to the portion of any underpayment which is attributable to 1 or more" of the situations set forth in subsection (b), including paragraph (6). In turn, paragraph (6) describes "[a]ny disallowance of claimed tax benefits *by reason of* a transaction lacking economic substance (within the meaning of section 7701(o)) or failing to meet the requirements of any similar rule of law." (Emphasis added.) Following the text of section 6662(b)(6), we must now consider whether "[a]ny disallowance of claimed tax benefits" is "by reason of" such "transaction lacking economic substance."

The most natural reading of this statute is that a lack of economic substance must be the cause of the disallowance of the claimed tax benefit (here, deductions for purported insurance premiums). *See, e.g.*, *City of S.F. v. EPA*, 145 S. Ct. 704, 715 (2025) (examining the "most natural reading" of a statute to determine its meaning).[19] For example, *Garner's Modern American Usage* notes that "by reason of is usually an artificial way of saying *because of*." Bryan A. Garner, *Garner's Modern American Usage* 124 (3d ed. 2009); *see also O'Gilvie v. United States*, 519 U.S. 79, 83 (1996) (noting that phrases "on account of," "by reason of," and "because of" have the same meaning); *Reason*, *The American Heritage Dictionary of the English Language* (4th ed. rev. 2006) (defining "by reason of" as "[b]ecause of"). Thus, we must determine whether the claimed tax benefits were disallowed "by reason of" (or "because of") a transaction lacking economic substance.

---

[19] The parties do not dispute—so we assume without deciding—that the deductions claimed for payments of purported policy premiums and other expenses on the Patels' tax returns constitute "claimed tax benefits" within the meaning of section 6662(b)(6).

Here, the NODs for tax years 2014 through 2016—the years in which section 6662(b)(6) is at issue—did not disallow the *deductions* for lack of economic substance. Rather, *penalties* for lack of economic substance were determined in each of the NODs. Further, the relevant Answers in these cases asserted the economic substance doctrine as a new ground upon which to disallow claimed deductions.

It is well settled that the Commissioner's determinations may be affirmed on grounds other than those set forth in an NOD. *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555 (1973); *Estate of Lassiter v. Commissioner*, T.C. Memo. 2000-324, 2000 WL 1545062, at *9. More specifically, the Commissioner is permitted to assert in an answer the economic substance doctrine as a new ground upon which to disallow a claimed benefit. *See, e.g.*, *Ax v. Commissioner*, 146 T.C. 153, 166 (2016) (permitting the Commissioner to amend an answer to assert as a new issue that a microcaptive lacked economic substance); *Claymont Invs., Inc. v. Commissioner*, T.C. Memo. 2005-254, 2005 WL 2848021, at *5, *9 (permitting the Commissioner to assert the economic substance doctrine in an answer).

In these cases, respondent asserted in relevant Answers that the deductions were disallowed by reason of (or because of) the economic substance doctrine. Moreover, respondent determined a section 6662(b)(6) penalty in the NODs. In *Patel II*, we did not need to decide whether the claimed tax benefits should be disallowed for lack of economic substance. But as noted above we must now decide whether the claimed tax benefits are disallowed for that reason, as an alternative ground to our holding in *Patel II*. *See* § 6662(b)(6).

As set forth *supra* Opinion Part II.D, the transactions at issue lacked economic substance. Thus, the disallowance of the claimed tax benefits is by reason of a transaction lacking economic substance within the meaning of section 7701(o), and section 6662(b)(6) is applicable in these cases. Therefore, we now sustain respondent's assertion of penalties under section 6662(a) and (b)(6) for tax years 2014 through 2016 on the ground that the transactions lacked economic substance.

F. *Increased Penalty Under Section 6662(i)*

Next, we must determine whether the Patels are subject to an increased rate under section 6662(i) for taxable years 2014 and 2015. Section 6662(i) increases the section 6662(a) penalty from 20% to 40% for any portion of an underpayment that is attributable to one or more

nondisclosed noneconomic substance transactions under section 6662(b)(6). *See also Oropeza v. Commissioner*, 155 T.C. 132, 140 (2020) ("[S]ection 6662(i) does not impose a distinct penalty. It simply increases the rate of the penalty imposed . . . for engaging in a transaction lacking economic substance.").

This is our first opportunity to consider what constitutes adequate disclosure under section 6662(i)(2). *See Royalty Mgmt. Ins. Co. v. Commissioner*, T.C. Memo. 2024-87, at *53–54 (noting that the Court has not considered "what constitutes 'adequate[] disclos[ure]' of a microcaptive transaction under section 6662(i)(2)" (alterations in original)). Section 6662(i)(2) explains that "the term 'nondisclosed noneconomic substance transaction' means any portion of a transaction [lacking economic substance] with respect to which the relevant facts affecting the tax treatment are not adequately disclosed in the return nor in a statement attached to the return."

In other contexts, we have determined that "[a]dequate disclosure is a factual question." *Highwood Partners v. Commissioner*, 133 T.C. 1, 21 (2009) (examining omitted gross income). For a disclosure to be adequate, it "must be sufficiently detailed to alert the Commissioner and his agents as to the nature of the transaction so that the decision as to whether to select the return for audit may be a reasonably informed one." *Estate of Fry v. Commissioner*, 88 T.C. 1020, 1023 (1987). "The disclosure must be more substantial than providing a clue that would intrigue the likes of Sherlock Holmes but need not recite every underlying fact." *Highwood Partners*, 133 T.C. at 21; *see also Estate of Reinke v. Commissioner*, 46 F.3d 760, 765 (8th Cir. 1995) ("To satisfy the disclosure requirement, the tax return must at least provide sufficient information to enable the Commissioner to identify the potential controversy involved."), *aff'g* T.C. Memo. 1993-197, 1993 WL 140748; *Accardo v. Commissioner*, 942 F.2d 444, 453 (7th Cir. 1991) ("[M]ere declaration of a deduction does not entitle taxpayer to a reduced penalty."), *aff'g* 94 T.C. 96 (1990); *Schirmer v. Commissioner*, 89 T.C. 277, 285–86 (1987) (finding that merely listing income and expense items is insufficient under prior version of section 6662); *Elliott v. Commissioner*, T.C. Memo. 1997-294, 1997 WL 351191, at *6 ("What is critical is whether the taxpayer adequately disclosed enough relevant data concerning the treatment of the item to alert the Commissioner to a potential controversy."), *aff'd*, 149 F.3d 1187 (8th Cir. 1998) (unpublished table decision); *Crouch v. Commissioner*, T.C. Memo. 1995-289, 1995 WL 377687, at *4 (finding that a specific form was not per se sufficient for adequate disclosure under section 6662(b)(1) if a "material

fact" is not disclosed); *Estate of Reinke v. Commissioner*, 1993 WL 140748, at \*7 (finding that adequate disclosure under old section 6661 required that the taxpayer "disclose the relevant facts").

We find that the Patels did not attach a statement to their returns, nor did they adequately disclose the relevant facts or provide sufficient information on their returns to enable respondent to identify the potential controversy involved. Among other things, the Patels' 2014 and 2015 returns did not reveal (1) the flow of funds from Dr. Patel to himself and his own family via intermediary entities; (2) the identities of, and relationships among, all the entities and individuals (e.g., CIC Services, Mr. Sean King, and Mr. Coomes) involved in the flow of funds; (3) how premium amounts were calculated; or (4) the Capstone pooling arrangement.[20] Accordingly, we will sustain the Commissioner's increased rate for the 2014 and 2015 taxable years.[21]

III.  *Negligence and Substantial Understatement of Income Tax*

Next, we turn to respondent's argument that the Patels are liable for accuracy-related penalties for negligence and substantial understatements of income tax. Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is penalizable on more than one of the grounds set forth in section 6662(b). *See New Phoenix Sunrise Corp. v. Commissioner*, 132 T.C. 161, 187 (2009), *aff'd*, 408 F. App'x 908 (6th Cir. 2010)). However,

---

[20] We do not intend to suggest that all, or any particular one, of these items had to be disclosed for the Patels to have adequately disclosed the transaction under consideration. We provide this list as examples of the many things not disclosed by the Patels.

[21] For the first time, in a footnote in a sur-reply, the Patels attempt to argue that "[t]he Notice 2016-66 invalidation and Forms 1120-PC negate Section 6662(i)." The Patels' argument is not fully developed, and burying arguments in footnotes is seldom appropriate. *See Nat'l Oilseed Processors Ass'n v. OSHA*, 769 F.3d 1173, 1184 (D.C. Cir. 2014) (observing that courts generally decline "to consider an argument if a party buries it in a footnote and raises it in only a conclusory fashion"); *Estate of Saunders v. Commissioner*, 745 F.3d 953, 962 n.8 (9th Cir. 2014) ("Arguments raised only in footnotes, or only on reply, are generally deemed waived."), *aff'g* 136 T.C. 406 (2011). Moreover, arguments made for the first time in a reply brief are deemed waived. *See Considine v. Commissioner*, 74 T.C. 955, 969–70 (1980) (characterizing as "untimely" and thus declining to consider an argument advanced for the first time in a reply brief); *Ashkouri v. Commissioner*, T.C. Memo. 2019-95, at \*24 n.9 ("Having conceded an issue by failing to advance a meaningful argument on that issue in their opening brief, [the taxpayers] could not withdraw that concession by belatedly including a cognizable argument in their reply brief."); *see also United States v. Smith*, 609 F. App'x 180, 185 (5th Cir. 2015).

as set forth *supra* pp. 10–11, section 6662(b)(6) does not apply for the 2013 taxable year. Moreover, we explain our position as an alternative ground to sustain the Commissioner's penalty determinations.

Section 6662(a) and (b)(1) and (2) imposes an accuracy-related penalty equal to 20% of the portion of an underpayment of tax required to be shown on a return that is attributable to "[n]egligence or disregard of rules or regulations" or "[a]ny substantial understatement of income tax." We will address each in turn before turning to the Patels' potential defenses.

### A. *Negligence or Disregard of Rules or Regulations*

Negligence includes any failure to make a reasonable attempt to comply with the provisions of the Code. *See* § 6662(c); *Higbee*, 116 T.C. at 448–49; Treas. Reg. § 1.6662-3(b)(1). Treasury Regulation § 1.6662-3(b)(1)(ii) provides that negligence is strongly indicated where a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit, or exclusion on a return that would seem "too good to be true" under the circumstances. *See also Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d 221, 234 (3d Cir. 2002) ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."), *aff'g* 115 T.C. 43 (2000). Disregard includes any careless, reckless, or intentional disregard of the rules and regulations. *See* § 6662(c); *Higbee*, 116 T.C. at 448.

Dr. Patel is extremely well educated; he holds multiple professional degrees. Moreover, he describes himself as a "savvy financial person" who did not need Mr. Fay's advice about financial products or the decision to form a captive. Rather, relying on his own self-study, Dr. Patel knew that he wanted to form a captive.

Despite his education, the record does not disclose any attempt by Dr. Patel to question or investigate whether it was proper for him to drastically reduce his tax liabilities in the manner he chose. This is exactly the type of "too good to be true" transaction that should cause taxpayers to seek out competent advice from independent advisers. *See Neonatology Assocs., P.A. v. Commissioner*, 299 F.3d at 234.

Moreover, Dr. Patel decided to move forward with forming a second captive in 2016, despite being on notice that the IRS was examining the captive arrangements formed by Mr. Coomes. We also

note that a member of Dr. Patel's family warned him about the increased scrutiny of microcaptive arrangements.

Under the circumstances, we conclude that Dr. Patel was negligent in that he failed to make reasonable attempts to comply with the tax law and failed to make reasonable attempts to determine the correctness of deductions that should have seemed to him too good to be true. *See id.* ("As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves.").

### B.  *Substantial Understatements*

An understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. *See* § 6662(d)(1)(A). We previously determined that the substantial understatement accuracy-related penalty is at issue for tax years 2014, 2015, and 2016. *See Patel I*, T.C. Memo. 2020-133, at *27. The table below demonstrates that there is a substantial understatement of income tax with respect to each of the Patels' returns for taxable years 2014 through 2016:

| Year | Tax Required to be Shown | Tax on Return | 10% of Tax Required to be Shown | Understatement |
|------|---------|---------|---------|---------|
| 2014 | $690,571 | $206,151 | $69,057 | $484,420 |
| 2015 | 1,001,336 | 526,150 | 100,134 | 475,186 |
| 2016 | 1,094,601 | 564,652 | 109,460 | 529,949 |

Accordingly, to the extent Rule 155 computations confirm there are substantial understatements of income tax, we sustain respondent's imposition of penalties for substantial understatements as each of the understatements at issue plainly exceeds $5,000 and is greater than 10% of the tax required to be shown. *See, e.g.*, *Swift v. Commissioner*, T.C. Memo. 2024-13, at *48, *aff'd*, 144 F.4th 756 (5th Cir. 2025); *Caylor Land & Dev.*, T.C. Memo. 2021-30, at *49–50.

### IV.  *Defenses to Accuracy-Related Penalties*

The Patels can avoid certain accuracy-related penalties if they had "substantial authority," or if they acted with reasonable cause and

in good faith, for the positions taken on their returns.[22] *See* §§ 6662(d)(2)(B)(i), 6664(c)(1); Treas. Reg. § 1.6664-4(a). As discussed above, the Patels appear to argue that Congress induced them to form captives and there was uncertainty in the law at the time the captives were formed. Thus, they argue that they should not be "punished." Moreover, we construe the portion of the Patels' statement of issues that sets forth summary arguments about penalties in the opening brief as an assertion that they: (1) had substantial authority and (2) acted with reasonable cause and in good faith.

### A.  *Substantial Authority*

A substantial understatement penalty generally may not be imposed if there was substantial authority for the deductions claimed. *See* Treas. Reg. § 1.6662-4(d)(1). Substantial authority for the treatment of an item exists only if the weight of the authorities supporting the treatment of the item is substantial in relation to the weight of authorities supporting contrary treatment. *Id.* subpara. (3)(i). The weight of the authorities is determined in the light of all relevant facts and circumstances. *Id.*

The substantial authority standard is an objective standard involving an analysis of the law and application of the law to the relevant facts. *Id.* subpara. (2). "In evaluating whether a taxpayer's position regarding treatment of a particular item is supported by substantial authority, the weight of authorities in support of the taxpayer's position must be substantial in relation to the weight of authorities supporting contrary positions." *Antonides v. Commissioner*, 91 T.C. 686, 702 (1988), *aff'd*, 893 F.2d 656 (4th Cir. 1990).

The Patels appear to assert that there was substantial authority for the Magellan and the Plymouth transactions for two reasons: (1) revenue rulings provided safe harbors and (2) prior captive cases supported their position. We have already rejected the Patels' arguments that the revenue rulings provided authority for their transactions. *See Patel II*, T.C. Memo. 2024-34, at *45. And no prior captive cases supported the allowance of deductions as insurance expenses for payments that were not made for insurance.

---

[22] Neither defense applies to portions of underpayment attributable to the codified economic substance doctrine. *See* § 6664(c)(2).

The authority cited by the Patels suggests only that a captive arrangement can exist when the requirements of insurance are met. But the evidence is clear that the Patels' captive arrangement never met, and was not designed to meet, the requirements of insurance envisioned by that authority. *See Neonatology Assocs., P.A.*, 115 T.C. at 101 (finding that the fact that the taxpayer-physicians attempted to surreptitiously withdraw money from closely held corporations in a case of first impression "in the setting of a speciously designed life insurance product" does not negate the fact that the underlying tax principles involved are well settled).

Further, contrary to the Patels' argument, the Court in *Avrahami*, 149 T.C. 144, did not cite uncertainty in the law as its reason to find substantial authority that supported a similar captive arrangement. Rather, after determining that the taxpayers had reasonably relied upon an adviser, the Court determined that the reliance was in good faith because the case was one of first impression involving a microcaptive. *Id.* at 207. However, as set forth below, the Patels have not presented evidence that they reasonably relied upon an adviser. Thus, *Avrahami*—which was decided after the transactions at issue—does not support a finding of substantial authority here.

Finally, the Patels argue that captive insurance precedent "told Sunil and his advisors that his business judgment remained well grounded in the law." In making this assertion, the Patels offer a string cite, without analysis, of various cases in the following order: *Helvering v. Le Gierse*, 312 U.S. 531 (1941); *Humana Inc. v. Commissioner*, 881 F.2d 247; *Harper Grp.*, 96 T.C. 45; *AMERCO & Subs. v. Commissioner*, 96 T.C. 18, 38 (1991), *aff'd*, 979 F.2d 162 (9th Cir. 1992); *Sears, Roebuck & Co. & Affiliated Corps. v. Commissioner*, 96 T.C. 61 (1991), *supplemented by* 96 T.C. 671 (1991), *aff'd in part, rev'd in part*, 972 F.2d 858 (7th Cir. 1992); *Rent-A-Center, Inc.*, 142 T.C. 1; *Securitas Holdings, Inc. & Subs. v. Commissioner*, T.C. Memo. 2014-225; *R.V.I. Guar. Co. & Subs. v. Commissioner*, 145 T.C. 209 (2015).

As an initial matter, several of the cases cited by the Patels were decided after Dr. Patel made the decision to form a microcaptive. Moreover, nothing in these cases permitted Dr. Patel to form a captive without any business rationale and for the sole purpose of obtaining tax benefits. We therefore conclude that there was no substantial authority supporting the Patels' position regarding the Magellan and the Plymouth transactions.

B. *Reasonable Cause and Good Faith*

Finally, section 6664(c)(1) provides that a penalty under section 6662 shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's position and that the taxpayer acted in good faith with respect to that portion. *See Higbee*, 116 T.C. at 448; *see also Swift v. Commissioner*, 144 F.4th at 771. The determination of whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). The Patels have the burden of proving that the negligence and the substantial understatement penalties are inappropriate because of reasonable cause. *See Higbee*, 116 T.C. at 446–447.

"Reasonable cause requires that the taxpayer have exercised ordinary business care and prudence as to the disputed item." *Neonatology Assocs., P.A.*, 115 T.C. at 98. The good faith reliance on the advice of an independent, competent professional as to the tax treatment of an item may meet this requirement. *Id.* (citing *United States v. Boyle*, 469 U.S. 241 (1985)). In determining whether the reasonable cause and good faith exception applies, we examine all the relevant facts and circumstances, including whether the taxpayers relied in good faith on professional advice and whether their reliance was reasonable. *See id.*; Treas. Reg. § 1.6664-4(b) and (c). Reliance on an adviser is reasonable if (1) the adviser was a competent professional who had sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. *Neonatology Assocs., P.A.*, 115 T.C. at 99.

The Patels argue in passing that Dr. Patel relied upon advisers in deciding to form the captives. *See Patel II*, T.C. Memo. 2024-34, at *4 n.6 (noting the record does not reflect that Dr. McAnally-Patel had any involvement in the purported microcaptive transactions but that our decisions in these cases will affect her joint federal income tax returns). The Patels do not identify these advisers in their argument. Thus, the Court is left to guess. The Court is not bound to sift through the record to develop arguments for a taxpayer, and we could reject the Patels' argument on this basis alone. *See Stringer v. Commissioner*, 84 T.C. 693 (1985) (refusing to sift through a voluminous and unintelligible record without the aid of a brief), *aff'd*, 789 F.2d 917 (4th Cir. 1986) (unpublished table decision); *Kersting v. Commissioner*, T.C. Memo. 1999-197, 1999 WL 398129, at *5 (noting that the Court is not required

to wade through voluminous records to develop arguments). Nonetheless, on the basis of the record, we assume without deciding that the Patels are referring to (1) Mr. Coomes; (2) Mr. Sean King; and (3) Mr. Fay.

We have held that a taxpayer cannot reasonably rely in good faith on an adviser who is a "promoter" of the disputed transaction. *Avrahami*, 149 T.C. at 206; *Swift*, T.C. Memo. 2024-13, at \*49. A promoter is "an adviser who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction." *106 Ltd. v. Commissioner*, 136 T.C. 67, 79 (2011) (quoting *Tigers Eye Trading, LLC v. Commissioner*, T.C. Memo. 2009-121, 2009 WL 1475159, at \*19), *aff'd*, 684 F.3d 84 (D.C. Cir. 2012).

We find that the Patels cannot reasonably rely on Mr. Coomes or Mr. Sean King (or anyone at CIC Services) because they were promoters of the Magellan and the Plymouth transactions. Mr. Coomes structured the captive transactions, drafted the purported insurance policies, and designed and set up the reinsurance programs, which he sold to his clients. *See Patel II*, T.C. Memo. 2024-34, at \*22–23 (describing Coomes's role in setting up the captives); *see also Avrahami*, 149 T.C. at 206 (finding an individual in a similar role was a promoter because she "structured the captive-insurance-company transaction, drafted the purported insurance policies, and designed and set up the failed risk-distribution programs"); *Swift*, T.C. Memo. 2024-13, at \*49 (finding that an individual in a role comparable to Mr. Coomes's was a promoter because she was the primary promoter of the transaction). Mr. Coomes also profited from the transactions, receiving a $5,000 ceding fee each year from each of the captives that participated in the Capstone pooling arrangement. *See Patel II*, T.C. Memo. 2024-34, at \*9, \*22–23; *see also Avrahami*, 149 T.C. at 206 (holding that individual who profited from transaction was a promoter).

Relatedly, Mr. Sean King and CIC Services also provided captive management services for Magellan and Plymouth. So at the same time that Dr. Patel and his purported captives affiliated with CIC Services, Mr. Sean King profited from the Capstone pooling arrangement. *Patel II*, T.C. Memo. 2024-34, at \*33–34 (describing ownership interests of individuals affiliated with CIC Services). Thus, we find that the Patels cannot reasonably rely on Mr. Coomes, Mr. Sean King, or anyone at CIC Services because they were also promoters of the microcaptive arrangement. *See 106 Ltd.*, 136 T.C. at 79 (finding that a promoter is

one who profits from the transaction or has an interest in the arrangement).

Mr. Fay is a closer call, but Dr. Patel's own testimony tips the balance. Dr. Patel repeatedly stated that he was not seeking advice from Mr. Fay about forming a captive. Rather, Dr. Patel already knew that he wanted to form a captive when he contacted Mr. Fay. *Patel II*, T.C. Memo. 2024-34, at *7–8. According to Dr. Patel, Mr. Fay did not know much about captives, and Dr. Patel simply wanted an introduction to someone who could help him form one. *Id.* Accordingly, we find that Dr. Patel did not rely upon Mr. Fay as an adviser to form his captive. Thus, we need not decide whether Mr. Fay was a promoter.

Aside from the advice from advisers, a court may also consider the taxpayer's "experience, knowledge, and education" to determine whether the taxpayer had reasonable cause and acted in good faith. Treas. Reg. § 1.6664-4(b)(1). Courts have long held that sophisticated taxpayers must recognize that when a transaction offers "fabulous" tax benefits, they are proceeding at their own peril and the transaction may be "too good to be true." *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 716 (2008) (citation omitted), *aff'd*, 608 F.3d 1366 (Fed. Cir. 2010).

Dr. Patel is highly educated and considers himself to be financially savvy. The evidence demonstrates that Dr. Patel was motivated predominantly by tax avoidance concerns. Considering his experience, knowledge, and education, we conclude that Dr. Patel did not have reasonable cause for his position, and he should have recognized a transaction that was too good to be true.

V.    *Conclusion*

On the basis of the foregoing, we sustain the Commissioner's section 6662(a) and (b)(6) penalties for tax years 2014 through 2016 and the increased rate under section 6662(i) for tax years 2014 and 2015. We also sustain the Commissioner's remaining accuracy-related penalty determinations for tax year 2013, and as an alternative position for tax years 2014 through 2016, as set forth herein and as limited by *Patel I*.

In reaching our conclusions, we have considered all arguments made by the parties, and to the extent not mentioned or addressed, they are irrelevant or without merit.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

URDA, *C.J.*, and KERRIGAN, BUCH, NEGA, PUGH, ASHFORD, COPELAND, TORO, GREAVES, MARSHALL, WEILER, WAY, LANDY, ARBEIT, GUIDER, JENKINS, and FUNG, *JJ.*, agree with this opinion of the Court.